| 41 | 505 |
| 91 | 346 |

| 41 | 505 |
| 101 | 272 |

WILLIAM MCMASTER ET AL v. BENJAMIN W. MERRICK ET AL.

*Waiver of lien by implication—Shifting credits.*

All liens created by implication may be waived by implication.

A lien is waived by implication if privileged and unprivileged claims are commingled in the same dealings so that the lien is not kept ascertainable without restating and charging the accounts.

A saw-mill was leased without rent but the lessees were to saw all logs furnished by the lessor and ship and season lumber as ordered. This agreement was to be in force through the whole period of the lease. *Held* that this contract evidently did not contemplate a lien since (a) the amount of work agreed for was indefinite and consisted of various items, and the rental value could not well be apportioned on it; (b) work was to continue until the end of the lease, when the lessee would be bound to quit and could not remain on the premises to enforce his lien; and (c) the obligation to ship was unlimited and might exhaust the whole of the lumber.

41 MICH.—64.

Where debits and credits have been made absolutely, both parties consenting, credits cannot afterward be shifted for the purpose of confining payments to unsecured liabilities.

A lien is waived if the parties entitled to it acquiesce in the action of third persons taking possession of the property on execution, without notifying them of their own adverse claims.

Error to Bay.   Submitted July 2.   Decided Oct. 8.

REPLEVIN.   Plaintiffs bring error.

*Hatch & Cooley* for plaintiffs in error.   There can be no lien without a continuous right of possession (Story on Agency, [8th ed.] § 362, n; *Jarvis v. Rogers*, 15 Mass., 389; *Walker v. Birch*, 6 Durn. & East, 258; *Randel v. Brown*, 2 How., 416; *Bevan v. Waters*, 3 C. & P., 520; *Forth v. Simpson*, 13 Ad. & El., [N. S.] 680; *Grinnell v. Cook*, 3 Hill, 485; *Danforth v. Pratt*, 42 Me., 50; *Stevens v. Faucet*, 24 Ill., 483; Phil. on Mech. Liens, § 506, or where the debtor's credit has been relied on either by agreement or usage, *Dunham v. Pettee*, 1 Daly, 112; *Bailey v. Adams*, 14 Wend., 201; *Peyroux v. Howard*, 7 Pet., 324; 2 Kent's Com., 638–9; in this case, if there was no lien on the lumber shipped while the mill was running, there could be none on that which was not shipped, *Stoddard Manuf. Co. v. Huntley*, 8 N. H., 441; a lien may be waived by confusion of accounts, *Wills v. Barrister*, 36 Vt., 220; *Driscoll v. Hill*, 11 Allen, 154; *Clark v. Stilson*, 36 Mich., 482; a lien is waived by allowing possession of the property to be taken without asserting it, *Brackett v. Hayden*, 15 Me., 347; *Bailey v. Quint*, 22 Vt., 474; *Gardet v. Belknap*, 1 Cal., 399; *Dixon v. Buck*, 42 Barb., 70; *Colwell v. Keystone Co.*, 36 Mich., 51.

*Shepard & Lyon* for defendants in error.   General payments should be so applied by the court to particular items of an account as to liquidate so much of the indebtedness as is not covered by any lien, *Youmans v. Heartt*, 34 Mich., 401; *Langdon v. Bowen*, 46 Vt., 512;

*King v. Andrews,* 30 Ind., 429; *McDaniel v. Barnes,* 5 Bush, 183; *Lash v. Edgerton,* 13 Minn., 219; *Upham v. Lefavour,* 11 Met., 184; *Chester v. Wheelwright,* 15 Conn., 562; *McQuaide v. Stewart,* 48 Penn. St., 198; *Stone v. Seymour,* 15 Wend., 20; *Field v. Holland,* 6 Cr., 8; *Smith v. Wood,* Saxt. Ch. (N. J.), 74; *Robinson v. Allison,* 36 Ala., 325; *Planters' Bank v. Stockman,* Freem. (Miss.) Ch., 502; *Stamford Bank v. Benedict,* 15 Conn., 438; *Vance v. Monroe,* 4 Gratt., 53; *Callahan v. Boazman,* 21 Ala., 246; one who has a lien is not estopped from asserting it merely by having acted as the agent of an assignee in bankruptcy who has taken possession, and who knew of his lien, *Copeland v. Copeland,* 28 Mc., 525; *Califf v. Hillhouse,* 3 Minn., 311; *Shaw v. Beebe,* 35 Vt., 205.

CAMPBELL, C. J. Plaintiffs, who are transferees from the assignee in bankruptcy of George Campbell & Co. replevied certain sawed lumber at Glencoe in Bay county from the defendants, who claimed to hold it under a lien for sawing the same as part of a large amount. The whole amount sawed was eight million feet. The amount remaining in defendant's hands when replevied was about three million feet. Under the charge the jury found defendants had a special property to the amount of $3,244.77. Plaintiffs claim that no lien ever existed for any sum. They also claim that assuming there had once been a lien, there had not only been a partial discharge by acceptance of negotiable paper, but a complete one by various acts and transactions to be referred to.

In the beginning of the year 1877, Geo. Campbell & Co. owned a sawmill and the apparatus and teams used with it, with a store, boarding house and blacksmith shop, at Glencoe, known as the Glencoe mill. On the 3d day of April, 1877, Campbell & Co. made what is in form a lease of the mill and all the other property to defendant Merrick, to hold the same without rent until November 15, 1877, the lessors agreeing further to make all repairs requiring an outlay of more than six dollars.

In consideration of this lease Merrick agreed as follows: that he would during the sawing season, between April 5 and November 15 "saw or cause to be sawed all logs furnished by the said parties of the first part, for the sum of one dollar and seventy-five cents per one thousand feet. And the said party of the second part further agrees to ship or cause to be shipped as per order for the said parties of the first part while [during] the running of said mill at thirty cents per thousand feet; and all lumber passing through the dry kiln in connection with said mill for shipment at the order of the said parties of the first part, the said party of the second part agrees that the same shall be handled and seasoned at eighty cents per thousand feet." The lessee also agreed to make all repairs under six dollars.

George Campbell & Co. were declared bankrupts to date from November 20, 1877. Sawing continued at the mill, accounts being kept in the name of C. Sheck and Merrick & Uberhurst until November 5, 1877, at which time there was unpaid a balance on book account of $1,782, and Merrick had negotiable paper to the amount of not far from $1,200, which he claimed should be added to that balance, and included with it under the lien.

The amount of sawing and other charges as entered on the books up to November 1, 1877, was on Sheck's books $16,727.13, and Merrick & Uberhurst $1,889.64. The sawing during five days in November not thus settled was $287.26. The debit side of the account consisted of a great number of small items charged from day to day including orders, money, merchandise, supplies and miscellaneous charges. This account was, as already stated, kept partly in the name of Christopher Sheck, and partly in the name of Merrick & Uberhurst. The Sheck account began in April, 1877, and included payments down to November 17, 1877, to the amount of $16,080.93. The Merrick & Uberhurst account ran from October 31 to November 30, and the debit side amounted to $1,-080.25. There was some small variance of testimony,

but nothing very material on this head. The accounts were admitted to be correct. Of the whole amount earned by Merrick, about $2,000 was for drying and shipping lumber. The remainder was for sawing. All the drying and shipping items occurred before the close of business.

The credits and debits were all entered in the same accounts as they arose and went together into the general balances; and the paper issued by Campbell & Co. in the shape mostly of accepted orders payable to various workmen or bearer, and which came into the hands of defendants, was charged as payments at the time of issue, on general account.

After the work was done the lumber not shipped remained on the premises. No one assumed possession after the lease ran out, while the bankruptcy proceedings were progressing, and Uberhurst continued to stay on the ground in one of the houses. There was conflicting testimony on the quality of his possession. The mill remained vacant. Some questions as to this arose out of the following facts:

In December, 1876, before the lease was made to Merrick, and before his sawing contract, Campbell & Co. gave to the First National Bank of Bay City an instrument by way of security for $28,000, authorizing the bank in case of default to take possession of any logs and lumber then owned or thereafter acquired, and sell and dispose of them to pay such money. This security was assigned October 19, 1877, to the Canadian Bank of Commerce, and at that time more than ten thousand dollars had become due and was unpaid. On the 2d day of November, J. F. Whittemore, acting for the Bank of Commerce, went to Glencoe and notified Uberhurst and others present that he claimed possession of the lumber, and proceeded without objection to go over the piles, and commenced shipping, employing several men and continuing shipments for eight days when the defendant Brock as sheriff took from him the remaining property. Before Whittemore went to Glencoe another bank agent,

Mr. Falconer, had gone there and notified Uberhurst that he took possession. To this Uberhurst made no objection, but merely wanted to know if shipping was to be stopped and the mill shut down. Whittemore received his instructions from Falconer. Mr. Whittemore bargained with Merrick to pay him the same price for shipping that Campbell & Co. were to pay. Merrick under this arrangement shipped 140,000 feet and was paid and receipted for 30 cents a thousand feet. Neither Merrick nor Uberhurst informed these parties of any claim of lien or possession.

After the bankruptcy proceedings were begun the United States Marshal took possession, and left the property in charge of Uberhurst; and upon the appointment of Herbert Bowen as assignee, he went up to Glencoe with the bankrupts and saw Uberhurst and told him of the appointment and that he—Bowen—had come to take possession, and Uberhurst accepted the case from him and was paid a dollar a day for his services in the matter.

The first question to be considered is whether any lien arose out of the contract itself. This question is not free from difficulty. The contract included three different kinds of work. The sawing would include all the lumber which was furnished. The drying would include only such parts as were to be treated in that particular way under instructions. The shipping was evidently expected to cover all the lumber, and most of it was in fact shipped. The contract did not provide when or how payment was to be made. It provided for no credit and no drawback for unfinished work. It is evident that it was made with the idea that no practical difficulty would arise between the parties, and with no regard to any failure on either side. The risks taken by the owners of the mill were quite as serious as those of the lessees.

The first thing which strikes us is the impossibility

of knowing just what was understood to be the real price of the work to be done. The mill belonged to the Campbells, and was leased to Merrick without rent. The owners, in addition to allowing the free use of their mill, agreed to keep it in repair except as to very small items. The price at which the work was to be done cannot be considered as independent of this use and repairing of the mill and other buildings, all of which must have had an important rental value, which could not very well be apportioned in dollars and cents on the price of sawing, because it could not be determined how much sawing was to be done.

Another consideration worth regarding is the fact that the contract contemplated that work might continue up to the very end of the lease, whereby, if any lien were to be created, the lessee could only enforce it by continuing on the premises when by the terms of the lease he was bound to quit.

A third consideration is that the obligation to ship lumber for thirty cents a thousand is unlimited, and it is difficult under this contract to see how Merrick could lawfully have refused to ship the whole of it as fast as sawed, if required, at that sum.

Whatever may be the legal implication of a lien, we think none was contemplated in fact when this contract was made, and none was ever thought of so far as the evidence shows until the credit of the mill-owners was so far shaken as to lead to bankruptcy proceedings.

It is a well-settled elementary doctrine that all liens created by implication may be waived by implication. It is also settled that one of the plainest cases of waiver is where privileged and unprivileged claims are mingled together in the same dealings, so that the lien is not kept ascertainable without restating and charging the accounts.

The dealings and conduct of the parties are therefore, in all doubtful cases, to be considered. Leaving out all disputed facts, the case shows that all the deal-

ings of these parties were conducted as if there was to be no discrimination in debits and credits. Both parties to the contract kept their books in the same way, and this was done with mutual knowledge and acquiescence. Debits and credits were made absolutely and not provisionally. We think it is not now admissible to treat these entries as if they were conditional, and to shift credits so as to confine the payments to unsecured liabilities. When parties have once so applied their credits as to wipe out so much of a consolidated account, the application in the absence of mistake is as effectual as if there had been separate accounts on which payments had been mutually applied specifically. The only rational way of treating these payments is to let them stand as paying in full so much of the debits as at any particular time equaled them, leaving the whole items accruing thereafter unpaid.

But applying them in this way, it is clear that thus far no lien was recognized, and none existed. To create one for the future when none was recognized in the past would be inconsistent with all rules of construction.

We also think that the repeated acquiescence of Uberhurst—and to some extent of Merrick—in shipping lumber for the bank, and in assuming charge for the various persons who set up absolute claims, without notifying them of any adverse claims of his own, cannot be legally reconciled with the continuance of such a lien. When shipments were made they were not made as subject to any claim on the remainder. When possession was held for the various consecutive claimants, the legal right to the possession of the land had reverted to Campbell & Co. and their assignees, and no pretense was made that the lessees held or intended to hold over. It was inconsistent with their lien, if they claimed one, that they took no steps to assert it distinctly when the whole facts appearing indicated its non-existence. The lumber after November 15 was on the premises of the general owner; and whether under such circumstances

a lien could have existed in any one else without removal, it certainly could not exist without some distinct possession, and was effectually negatived by the recognition without denial or qualification, of a right of possession and disposal in the assignees and transferees of the general owner.

No authorities were cited which are quite apposite to this case, which was chiefly argued on principle. We are very strongly inclined to the opinion that the contract itself is inconsistent with a lien. But we have no doubt that the conduct of the parties in such matters as are admitted on both sides was such as to negative any such right, and to entitle the plaintiffs to the principal charges requested, which would have terminated the controversy.

Judgment must be reversed with costs and a new trial granted.

The other Justices concurred.