THE UNION TRUST COMPANY

*v.*

LYMAN TRUMBULL *et al.*

*Filed at Ottawa March 30, 1891.*

146:149 Ind 57
30 LRA 38
39 LRA 73

1. LIENS—*legal and equitable—of the distinction.* A principal distinction between an equitable lien on personal property, and one upon such property which the law will recognize, is, that an equitable lien is not conditioned upon the possession of the fund or specific property charged with the payment of the particular debt.

2. SAME—*banker's lien—for advances on bills of lading—what essential to the lien.* Where a bank makes advances on bills of lading of goods, but suffers the purchaser to take and retain the possession of the goods, and to sell them and account for the proceeds, and from time to time renews the notes given for such advances, so that the claim of the bank on the purchaser consists merely of over-drafts and other unsecured debts, and the bills of lading do not correspond in dates or amounts with its notes, the bank will have no specific lien upon the goods which it can enforce against an assignee of the debtor.

3. SAME—*lien on goods of debtor—burden of proof.* A party setting up a claim of a specific lien upon the goods of his debtor in the hands of an assignee, under an assignment for the benefit of creditors, must establish his right thereto. The burden of proof rests on him, and not upon the other creditors, to disprove his claim.

4. SAME—*warehouse receipt—by whom—in order to give a lien.* It is only when property is stored in a public warehouse that a receipt may be given which is evidence of a lien upon the property.

5. SAME—*pledge—warehouse receipts—of the possession of the property—as essential to the lien.* Actual or symbolical possession of personal property in the pledgee is essential to its pledge. Ordinarily, actual and physical possession of the property is delivered to and retained by the pledgee; but when the actual delivery is to a carrier or warehouseman, and a bill of lading or a warehouse receipt is given therefor, the transfer of such bill of lading or indorsement of such warehouse receipt, with delivery thereof to the pledgee, is regarded in law as the delivery of possession to the pledgee of the property which the instrument represents, the bill of lading or receipt standing in the place of the property of which it is the symbol.

6. But it is a necessary condition to the existence of such symbolical possession by the pledgee, that the property itself is in the possession of some person or corporation other than the pledgor.

7.  So the indorsement and transfer of warehouse receipts for goods will not constitute a valid or legal pledge of the goods for which the receipts are hypothecated, if the company issuing them has no possession and control of the goods, or the property therein named has not been so set apart and distinguished as that it can be found and identified by the receipts.

8.  After the transfer, in pledge, of warehouse receipts of wool in the possession and control of the pledgor, and not set apart from other wool in the hands of the warehouseman, the pledgor made an assignment for the benefit of creditors, and the assignee took possession. The company issuing the receipts for the property, by indirection entered the building and placed an agent in charge of the wool, the assignee also still holding possession : *Held,* that the possession thus obtained by the company was insufficient to support the warehouse receipts previously issued by it. Two different persons can not be in the actual, adverse possession of the same property or premises at the same time.

9.  SAME—*equitable lien—identity of the property—how far essential to the lien—as to property of like kind.* To support an equitable lien there must be an ascertainment and identification of the property which is the subject of the lien ; but only such an identification is required as is essential to an enforcement of the lien, and an identification can be made as well by an application of the equitable principle of estoppel as in any other way.

10. A warehouseman issued warehouse receipts, which, on their face, appeared to be in strict conformity to the law, but in fact the possession of the property receipted for continued with the person to whom the receipts were issued, and the goods were not set apart and distinguished from other goods of the like kind. The holder of the receipts pledged them, for a loan of money, to innocent *bona fide* parties, who had no notice of any irregularities, or failure to comply with the law by the warehouseman, and then made a general assignment of his property for the benefit of creditors, and his assignee took possession of the goods. The pledgees of the receipts were willing to take, jointly, the goods on hand, which was less than the amounts called for in the receipts: *Held*, that as against the assignee of the insolvent debtor, and general creditors, the receipt holders or pledgees were entitled to an equitable lien on the like goods found in the warehouse.

11. SAME—*lien upon personal property — how created—"creditors"— possession.* There is no mode under our law, except by chattel mortgage duly acknowledged and recorded, by which the owner of personal property, retaining its possession, can give another a lien upon it that can be enforced against creditors and subsequent purchasers. By "creditors" are meant, not general creditors, or creditors at large, but only such creditors as are armed with an execution or writ of attachment, or other process of court, are regarded as creditors, in the sense

that they are authorized to impeach a conveyance or transfer of property by their debtor for fraud, or question the validity of an equitable lien on personal property that is good as against the debtor himself, and his heirs, executors, administrators and voluntary assignees.

12. It is a general rule, that whenever a right in equity attaches against a person, that equitable right binds all persons claiming under or against that person, who have not special liens on any of the property; and it follows, that general creditors are, in all cases, bound by a particular equity.

13. SAME—*waiver of lien—commingling of interests.* By commingling privileged claims with those for which there is no lien, so that the amount of the lien is not kept ascertainable without restating the accounts, the lien is impliedly waived.

14. INSOLVENT DEBTORS—*in the county court—nature of the proceeding—as in chancery.* A proceeding in the county court, under the act relating to assignments by insolvent debtors, is not a purely statutory proceeding, but is a chancery proceeding, modified and regulated by statute. It is a suit in chancery, within the meaning of the statute relating to the jurisdiction of appellate courts.

15. SAME—*title of assignee—subject to equities.* Where property is assigned by debtors for the payment of their debts, the assignee takes the title as a volunteer, and subject to all the liens, equities and burdens to which it was subject in the hands of the assignors.

16. APPEALS—*from county court to Appellate Court—amendatory act of 1889.* An appeal lies from the final judgment, order or decree of the county court, in the administration of an insolvent's estate, arising under a general assignment for the benefit of creditors, to the Appellate Court, and not to the circuit court.

17. Section 25, chapter 37, of the Revised Statutes, as amended in 1889, giving Appellate Courts jurisdiction of appeals from and writs of error to county courts, in suits or proceedings at law or in chancery, when no franchise, freehold or validity of a statute is involved, repeals, by implication, so much of section 122 of same chapter as is in conflict with its provisions.

18. SAME—*appeal from a part of a decree.* In case different parts of a decree relate to matters independent of each other, so that the decision of one part has no influence or bearing upon the decision of the other part, they are severable, and, in effect, distinct decrees, and an appeal may be taken from either part without bringing in review the record as to the other part.

19. But when each claimant of a specific lien upon particular property is, if not entitled to such lien, a general creditor of an insolvent debtor who has made an assignment, and as such entitled to share in

the distribution of any fund that may be found to exist in favor of general creditors, and the loss of a specific lien is the gain of the other creditors, so that each creditor is directly interested and affected by every part of the decree, an appeal by a portion of the parties will bring up the entire record, and any of the appellees will have the right to assign cross-errors.

20.  STATUTE—*title of an act*—*repeal by implication.* A statute perfect in itself may repeal another part of a law by implication, although such repeal is not expressed in the title of the repealing statute.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the County Court of Cook county; the Hon. RICHARD PRENDERGAST, Judge, presiding.

Messrs. GOUDY, GREEN & GOUDY, for the appellant:

The Appellate Court has no jurisdiction of the case. An appeal is given only to the circuit court. County Court act, secs. 122, 123; Appellate Court act, sec. 8; *Traver* v. *Rogers,* 16 Bradw. 372.

The final order of the county court giving appellant the proceeds of the Ayres & Fell wool, was correct. Hall & Co. never had any title to that wool which they could transfer, and that wool was never stored with or in the possession of the storage company.

As to the right of part of the partners to make an assignment, see *Harrison* v. *Jackson,* 7 Durn. & E. 207; *Anderson* v. *Tompkins,* 1 Brock. 456; *Robinson* v. *Crowder,* 4 McCord, 519; *Harrison* v. *Story,* 5 Cranch, 300; *Hennessy* v. *Banks,* 6 W. & S. 300; *Gordon* v. *Cannon,* 18 Gratt. 387.

Neither the storage company nor its receipt holders had any title to or lien upon the Ayres & Fell wool in the warehouse at the time of the assignment, and are in no way interested in any litigation in regard to the proceeds thereof. As to the equitable lien, see Pomeroy's Eq. Jur. secs. 165, 166, 1235; *Cord* v. *Jaffray,* 2 S. & L. 381; *Payne* v. *Wilson,* 74 N. Y. 348.

Mr. HENRY S. ROBBINS, and Mr. CHARLES L. BROOKE, for. the appellees:

As to the jurisdiction of the Appellate Court, see Appellate Court act, sec. 8; County Court and Assignment acts.

The amendment to section 8 of the Appellate Court act is a repeal, by implication, of so much of sections 122 and 123 of the County Court act as is repugnant thereto. *Canal* v. *Chicago,* 14 Ill. 334; *Geisen* v. *Heiderich,* 104 id. 540; *People* v. *Wright,* 70 id. 388; *Timm* v. *Harrison,* 109 id. 593; *Fowler* v. *Pirkins,* 77 id. 277; *Johnson* v. *People,* 84 id. 377; *Ashford* v. *People,* 82 id. 214; *Steele* v. *Steele,* 89 id. 52; *Bank* v. *Rehm,* 27 Bradw. 172.

The equitable lien is lost by losing means of identifying the same. *Drake* v. *Taylor,* 6 Blatchf. 14; *Grinnell* v. *Suydam,* 3 Sandf. 134.

An attempt to make a legal mortgage, which fails from some informality, is valid in equity. *Payne* v. *Wilson,* 74 N. Y. 351; *Lanning* v. *Tompkins,* 45 Barb. 308; *Read* v. *Gaillard,* 2 Dessau. Eq. 552; *Love* v. *Sierra,* 32 Cal. 639; *Husted* v. *Ingraham,* 75 N. Y. 251; *Printup* v. *Barrett,* 46 Ga. 410.

Where a mortgage covers chattels to be acquired *in futuro,* and is for this reason invalid in law, equity carries out the intention of the parties, and sustains it as an equitable mortgage. *Mitchell* v. *Winslow,* 2 Story, 630; *Seymore* v. *Railroad Co.* 25 Barb. 300; *Webster* v. *Nichols,* 104 Ill. 160.

So where one signed an indemnity bond to secure the release of property under attachment, upon the promise that the property should be held by the owner as security to the surety against loss, it was held this created an equitable lien, good as against general assignees and creditors. *Arnold* v. *Morris,* 7 Daly, 498.

Other cases where liens in the nature of equitable mortgages are held to have arisen from defective or informal arrangements for security, are *Parker* v. *Muggridge,* 2 Story, 342; *Hill* v. *Omaha,* 49 N. Y. 632; *Williams* v. *Ingersol,* 23 Hun,

284; *Dow* v. *Kerr,* Speer's Eq. 415; *Kirksey* v. *Means,* 42 Ala. 426; *Railroad Co.* v. *Tallman,* 15 id. 472; *Card* v. *Jaffray,* 2 S. & L. 374; *Walsh* v. *Usher,* 2 Hill's Ch. 168; *Taylor* v. *Wheeler,* 2 Vt. 565; *Ligard* v. *Hodges,* 1 Ves. Jr. 477.

The assignee of an insolvent takes as a volunteer, and subject to all liens, equities, etc., enforcible against the assignor. *O'Hara* v. *Jones,* 46 Ill. 292; *Jenkins* v. *Pierce,* 98 id. 646; *Hardin* v. *Osborne,* 94 id. 571; *Strong* v. *Clawson,* 5 Gilm. 349; *Eames* v. *Mayo,* 6 Bradw. 334.

An equitable lien is good against the general creditors of the insolvent, their rights not being greater than those of the assignee. *Mitchell* v. *Winslow,* 2 Story, 630; *Van Hensen* v. *Radcliff,* 17 N. Y. 580; *Walker* v. *Miller,* 11 Ala. 1067; *Warner* v. *Jameson,* 52 Iowa, 72; Powell on Mortgages, 459.

In the absence of statutory provisions in reference to the recording of chattel mortgages such as exist in this State, an equitable lien without possession will prevail against a subsequent execution creditor. *Holroyd* v. *Marshall,* 10 H. L. Cas. 191; *Dow* v. *Kerr,* 1 Speer's Eq. 414; *Welsh* v. *Usher,* 2 Hill's Ch. 168; *Massey* v. *McIlvain,* id. 428; *Smithurst* v. *Edmunds,* 1 McCarty, 404; *Borden* v. *Croak, supra.*

Mr. JAMES FRAKE, for the appellee Vehmeyer:

That a warehouseman having property of his own stored, may part with his title to it by giving an ordinary warehouse receipt, the authorities fully sustain. *Broadwell* v. *Howard,* 77 Ill. 305, and authorities cited; *Cool* v. *Phillips,* 66 id. 216; *Taylor* v. *Turner,* 87 id. 296; *Burton* v. *Curyea,* 40 id. 320; *Bank* v. *Wellington,* 48 Mich. 118; *Cochran* v. *Ripy,* 13 Bush, 495; *Gibson* v. *Bank,* 11 Ohio St. 311.

Mr. FARLIN Q. BALL, for the appellee Kinsey, assignee:

An assignee of an insolvent is something more than a mere representative of the assignor, and the county court is vested with powers analogous to those adopted by courts of equity in

administering estates through the agency of a receiver. *Traver* v. *Rogers,* 16 Bradw. 374; *Colby* v. *O'Donnell,* 17 id. 474; *Paddock* v. *Bates,* 19 id. 476; *Boyden* v. *Frank,* 20 id. 176; *Freydendall* v. *Baldwin,* 103 Ill. 325; *Hanchett* v. *Waterbury,* 115 id. 220; *Field* v. *Ridgely,* 116 id. 424.

The rights of all creditors must stand as they were at the date of the delivery of the deed of assignment. No subsequent action by any of them could strengthen or enlarge such rights. *Rumsey* v. *Town,* 22 Fed. Rep. 558.

The claim of each of the contending parties is, that he is a pledgee. No other basis for his right is shown. The whole interest of a pledgee in a pledge depends upon possession, and continuous possession. That abandoned, the pledge at once fails; that never taken, the pledge never existed. *Bank* v. *McCrea,* 106 Ill. 281; *Holmes* v. *Crane,* 2 Pick. 610; *McFarland* v. *Wheeler,* 26 Wend. 467.

If the pledge be suffered to remain in the hands of the pledgor, upon insolvency, the title thereto passes to the assignee. *Allen* v. *Massey,* 17 Wall. 353; *Casey* v. *Caveroc,* 96 U. S. 467; *Haynes* v. *Tiffany,* 25 Ohio, 549; *Shitman* v. *Insurance Co.* 29 Conn. 245.

The pledge must be of specific property. It must be separated, by marks, position or otherwise, from all like goods. It must appear that the identical thing pledged came into the possession of the assignee. The pledgee can not claim like goods. Unless these facts, among others, appear, the special claimant fails in his attack upon the general fund, for the burden of proving his privilege is upon him. *Wood* v. *Fales,* 12 Harr. 246; *Haggerty* v. *Palmer,* 6 Johns. Ch. 434; *Black* v. *Bogert,* 65 N. Y. 601; *Collins* v. *Buck,* 63 Me. 459.

While the authorities are not uniform upon this question, the current of the decisions is, that a valid deed of assignment can be made by a number less than all the partners. Among the cases so holding are *Anderson* v. *Tompkins,* 1 Brock. 456; *Harrison* v. *Sterry,* 5 Cranch, 289; *Mills* v. *Barber,* 4 Day,

428; *Pearpoint* v. *Graham,* 4 Washb. Ch. 232; *Robinson* v. *Crowder,* 4 McCord's L. 519; *Egbert* v. *Woods,* 3 Paige, 517; *McCullough* v. *Somerville,* 8 Leigh, 415; *Deckard* v. *Case,* 5 Watts, 22; *Kemp* v. *Comley,* 3 Duer, 1; *Forbes* v. *Scanlon,* 13 Cal. 242; *Stein* v. *Le Don,* 13 Minn. 412; *Williams* v. *Frost,* 27 id. 255.

Mr. JUSTICE BAKER delivered the opinion of the Court:

This is a contest between creditors of T. W. Hall & Co. as to their respective rights to the property which T. W. Hall & Co. assigned to John Kinsey for the benefit of their creditors, and upon which several of the creditors claim liens.

The firm of T. W. Hall & Co., composed of Thomas W. Hall, Charles Hall and William P. Hall, were merchants and factors in wool, having their office and warehouse in two connected buildings, known as Nos. 46 to 52 Dearborn avenue, Chicago. The firm was a customer of and kept a general deposit account with the Union Trust Company, a banking institution. The National Storage Company, in response to applications made therefor, issued to T. W. Hall & Co. receipts acknowledging the receipt of certain amounts of wool, and undertaking to deliver the same to the order of T. W. Hall & Co., at its warehouse No. 18, on the premises above mentioned, upon the payment of storage and charges, and the surrender of the receipts, properly endorsed. Thereupon T. W. Hall & Co. borrowed of Lyman Trumbull $8500, of the Commercial National Bank $17,500, of the Illinois Trust and Savings Bank $11,283.54, of Ira Tomblin $10,000, of the Union National Bank $6402.88, and of the Metropolitan National Bank $3000, and to secure these several loans delivered to the respective lenders certain of the above mentioned warehouse receipts, properly endorsed. William Parberry, Henry Kertz, Grande Bros., Patterson Bros. and Lienemann & Schmidt, severally, shipped to T. W. Hall & Co., as factors, certain

quantities of wool, parts of which had not been accounted for at the time of the assignment. T. W. Hall & Co. issued and delivered to Henry F. Vehmeyer, and to the Lincoln National Bank, respectively, as security for moneys borrowed from each of them, their own receipts, acknowledging that they had received in store specified quantities of wool, subject to the orders of said respective parties on said receipts, on surrender thereof, "storage and insurance free."

In the summer of 1888 Thomas W. Hall left Chicago and went west, on business of the firm. Afterwards, and on July 19 of that year, his partners executed and delivered to John Kinsey, as assignee, an instrument purporting to be a voluntary assignment of the firm of T. W. Hall & Co. This instrument was recorded in the office of the recorder of Cook county on the day of its date, and filed with the clerk of the county court on the same day. At that time the warehouse at 46, 48, 50 and 52 Dearborn avenue contained 318,683 pounds of wool, and it was all stored upon the second and third floors of the connected buildings. Kinsey at once took exclusive possession of the entire warehouse, including the second and third floors and all their contents. On the next day, July 20, the National Storage Company, by a ruse, managed to get one of their men into the warehouse, and claimed, through him as their agent, to be in actual possession of the second and third floors and of the wool there stored. A dispute as to the possession of said two floors and their contents thereupon arose between the assignee and the storage company, which, by arrangement between them, resulted in an order by the county court, on July 23, directing the assignee to hold possession until the rights of all parties could be determined, and without prejudice to either, and ordering the storage company to yield possession to the assignee. On July 21, Thomas W. Hall, by an instrument duly recorded and filed, ratified and confirmed the assignment to Kinsey.

On July 23, a further order was made by the county court that the assignee file a petition making parties respondent thereto all persons, as far as ascertainable, who have or claim interest in or to the merchandise and premises, requiring them to answer the said petition, and to set forth their respective rights, and to submit themselves to the jurisdiction of the court in the premises. The assignee filed such petition, and the several persons and corporations above named were made respondents therein, and they filed their respective answers, and, by consent of parties, it was ordered that said answers be taken also as cross-petitions in behalf of the respective parties.

The assignee, by direction of the county court, sold all the wool that came to his hands, the proceeds thereof being $51,-739.03. The cause was afterwards heard in the county court, and a decree entered, wherein it was ordered that the assignee, out of the proceeds of $51,739.03 reported by him, retain the sum of $5353.37 for items of expense and fees allowed him, and that he pay the residue of said sum of $51,739.03 as follows: To Patterson Bros., $5072.35; to Lienemann & Schmidt, $6092.11; to Grande Bros., $2011.64; to Henry Kertz, $857.01; to William Parberry, $2268.32; to the Union Trust Company, $9523.22; and to the National Storage Company, for the benefit of its receipt holders, as their several rights may appear, the sum of $20,561.01. By the decree, Vehmeyer and the Lincoln National Bank were denied all rights as secured creditors.

The National Storage Company and its several receipt holders appealed from this decree to the Appellate Court for the First District, and in that court both errors and cross-errors were assigned. In the Appellate Court the decree of the county court was affirmed in respect to the claims of Patterson Bros., Lienemann & Schmidt, Grande Bros., Henry Kertz, William Parberry, Henry F. Vehmeyer and the Lincoln National Bank. The Appellate Court, however, reversed the

order and decree of the trial court awarding $9523.22 to the Union Trust Company, and held it was error to give to that corporation a better standing than that of a general creditor without security.  The Appellate Court also held that the net proceeds of all the wool on the second and third floors of the warehouse, except what was directed to be paid to Patterson Bros., Lienemann & Schmidt, Grande Bros., Kertz and Parberry, should be awarded to the National Storage Company, for the use of its receipt holders, and it reversed the decree and remanded the cause to the county court, with directions to enter a decree in conformity with its opinion.  Appeals from the judgment of the Appellate Court were taken to this court, both by the Union Trust Company and by the receipt holders of the National Storage Company, and numerous errors and cross-errors were here assigned.

Before proceeding to a consideration of the merits of the case, we must determine, first, whether the Appellate Court had jurisdiction to render any judgment in the case; and if it had, second, what parts of the record of the lower courts are properly before us by reason of these appeals.

*First*—It is enacted in section 122 of the County Court act of 1874, (Rev. Stat. 1874, chap. 37, sec. 187,) that "appeals may be taken from the final orders, judgments and decrees of the county courts to the circuit courts of their respective counties, in all matters, except as provided in the following section."  Section 123 of said act, as amended by the act of 1881, (Laws of 1881, p. 66,) is as follows: "Appeals and writs of error may be taken and prosecuted from the final orders, judgments and decrees of the county court to the Supreme Court or Appellate Court, in proceedings for the confirmation of special assessments, in proceedings for the sale of lands for taxes and special assessments, and in all common law and attachment cases, and cases of forcible detainer and forcible entry and detainer.  Such appeals and writs of error shall, when not otherwise provided, be taken and prosecuted

in the same manner as appeals from and writs of error to circuit courts." And it is insisted, that inasmuch as proceedings under the act in relation to voluntary assignments for the benefit of creditors (1 Starr & Curtis, 1303,) do not come within the enumeration of this section, the appeal should have been to the circuit court, and not to the Appellate Court. But in our opinion this question can not be determined solely by a reference to these sections.

Section 11, of article 6, of our constitution, confers upon the General Assembly power, after the year 1874, to create "inferior Appellate Courts, * * * to which such appeals and writs of error" as it may provide "may be prosecuted from circuit and other courts," etc; and it would therefore seem to be clear that a section defining the cases of which the Appellate Court shall have jurisdiction would be strictly germane to an act creating that court, and, indeed, much more so than to the act creating the court the judgment or decree of which is to be the subject of review by the Appellate Court. The General Assembly, pursuant to the power thus conferred, by an act approved June 2, 1877, (Laws of 1877, p. 69,) established Appellate Courts, and, after providing for their organization, defined their jurisdiction in the eighth section thereof. This section did not, however, include final judgments, orders or decrees of county courts; but said section was amended by an act of the General Assembly, approved June 6, 1887, (Laws of 1887, pp. 156, 157,) so as to read, so far as is material to the present question, as follows: "The said Appellate Courts created by this act shall exercise appellate jurisdiction only, and have jurisdiction of all matters of appeal or writs of error from the final judgments, orders or decrees of any of the circuit courts, or the Superior Court of Cook county, or county courts, or from the city courts in any suit or proceeding at law or in chancery, other than criminal cases not misdemeanors, and cases involving a franchise or freehold or the validity of a statute. Appeals and writs of error shall lie from the

final orders, judgments or decrees of the circuit and city courts, and from the Superior Court of Cook county, directly to the Supreme Court, in all criminal cases, and in cases involving a franchise or freehold or the validity of a statute." Undoubtedly the effect of this section is to repeal so much of section 122, *supra*, as is in conflict with it; but since this is only a repeal by implication, because both can not at the same time be law upon the same subject, and the act embracing this section is perfect in itself, it is not in violation of the provision of the constitution requiring the subject of the act to be expressed in its title. *The People* v. *Wright*, 70 Ill. 388; *Timm* v. *Harrison*, 109 id. 597.

But counsel contend that this proceeding is neither a suit or proceeding at law or in chancery, but is purely a statutory proceeding. We can not concur in this view. Assignments for the payment of debts to creditors were valid at common law, and as soon as the assignee accepted an assignment for that purpose he became a trustee for the creditors, and they might compel the execution of the trust in a court of chancery. (Perry on Trusts, sec. 594.) It will be observed that the statute in relation to voluntary assignments for benefit of creditors (1 Starr & Curtis' Stat. 1303,) does not assume to create a right, but that it merely assumes to modify and regulate an existing right. It does not define what is a "voluntary assignment," nor say that it shall thereafter be lawful to make voluntary assignments, but simply imposes restrictions thereon, —in other words, modifies and regulates existing common law rights; and since, manifestly, a mere modification and regulation of an existing common law right can not make it purely a statutory right, the trust in behalf of creditors, by virtue of a voluntary assignment, is no less a subject of equitable cognizance since the enactment of this statute than it was before its enactment, and hence, if no tribunal had been named for the enforcement of the provisions of the statute, it would have devolved upon a court of chancery to do so. The proceeding

is not a statutory proceeding, but a chancery proceeding, modi-
fied and regulated by statute. It is true, as to the county
court, it is a new and special jurisdiction, as held in *Hanchett*
v. *Waterbury,* 115 Ill. 227; but so is any chancery or common
law jurisdiction conferred upon that court, for it exercises no
inherent common law or chancery jurisdiction.

We therefore hold that this is "a suit or proceeding in chan-
cery" in the county court, limited to the purposes declared in
the several provisions of the act, within the meaning of sec-
tion 8 of the Appellate Court act, as amended by the act of
June 6, 1887, *supra,* and hence that the appeal was properly
to the Appellate Court instead of to the circuit court.

*Second*—We said in *Walker* v. *Pritchard et al.* 121 Ill. 227:
"Where different parts of a decree relate to matters wholly
independent of each other, so that the decision of one part has
no influence or bearing upon the decision as to the other part,
they are severable, and, in effect, distinct decrees, and an
appeal may consequently be made from either part without
affecting the record as to the other part." But that can have
no application here, where each claimant of a specific lien
upon particular property is, if not entitled to such lien, a
general creditor of the Halls, and, as such, entitled to share
in the distribution of any fund that may be determined to
exist in favor of general creditors. Vehmeyer, whose claim
was rejected, is clearly a general creditor of the Halls, and as
such he is affected by every decree in favor of parties claiming
specific liens upon the property assigned. So, too, the decree
against his lien directly benefited the receipt holders of the
storage company, because it added that much property which
the court held they were entitled to resort to for payment of
the amounts claimed upon their receipts, and as to each claim-
ant the loss of one is the gain of another, and therefore each
one is directly interested in and affected by every part of the
decree. Nor is it possible that a decree might have passed as
to the claims of some without disposing of the rights of all

others. In our opinion, therefore, the appeals to the Appellate Court brought the entire record before that court, and the appeals to this court bring the entire record here, and this being so, the statute gives the right to any of the appellees to assign cross-errors that may choose to do so. Rev. Stat. 1874, chap. 110, sec. 79.

We come now to the several questions discussed upon the merits.

*First*—The Appellate Court held that the amount of money advanced by the Union Trust Company upon wool shipped by Ayres & Fell, and which was unpaid at the time of the hearing in the county court, is purely conjectural, and, for that reason, that the evidence failed to sustain the claim of the Union Trust Company for a specific lien on the Ayres & Fell wool. The contention of the Union Trust Company is, that T. W. Hall & Co. were dealing in wool as factors; that T. W. Hall was in the habit of going west, annually, before the time of shipping wool for that season, and making contracts with shippers and producers of wool, for the consignment of wool to T. W. Hall & Co.; that in June, 1887, before starting on his annual trip, T. W. Hall, on behalf of his firm, made a contract with Stephen W. Rawson, president of the Union Trust Company, on behalf of that company, whereby the trust company was to pay an amount, not exceeding $100,000, on drafts drawn for advances on wool consigned to T. W. Hall & Co. during that summer. The bills of lading of each consignment upon which the trust company should pay the advances were to be delivered to and retained by that company as security for the repayment of the advances. T. W. Hall & Co. were to place the wool in a particular room of their warehouse, which they agreed to rent to the trust company for its storage, but no actual possession was ever taken of the room by the trust company, nor did T. W. Hall & Co. place all the wool on which the trust company made advances, in that room. T. W. Hall & Co. were to sell the wool, and account for the

proceeds of sale to the trust company, to the amount of the advances made by it, and for the balance, less expenses and commissions, to the shippers. Pursuant to this contract, wool was consigned to T. W. Hall & Co. by shippers from Oregon, Montana and other States and Territories. Drafts were drawn on T. W. Hall & Co. for advances on each consignment, which were paid by the Union Trust Company. Upon their payment the bills of lading were delivered to the trust company, and T. W. Hall & Co. also executed and delivered to the company their promissory notes for the amounts of the payments made upon the drafts. The wool was also insured by T. W. Hall & Co. for the benefit of the trust company, as its interest might appear.

At the time of the assignment the trust company claims to have held drafts paid by it on account of wool shipped by Ayres & Fell, of East Oregon, to the amount of $18,507.04, and the trust company claims, and, as has been before stated, the county court found, that T. W. Hall & Co. at that time had in their possession 68,530 pounds of the Ayres & Fell East Oregon wool, the proceeds of which amounted to $9523.22. The evidence shows that $4577.67 of this $18,507.04 represents four drafts for advances on consignments made in 1886, and that the wool on hand at the date of the assignment was all consigned in 1887, and so the lien in behalf of the trust company, at the utmost, could only be good for $13,929.37; but since the sale of the wool upon which the lien is claimed produced only $9523.22, this is unimportant, any further than it may be a circumstance to be considered in determining the identity of the amount claimed to be due, with the amount paid on the drafts for advances on the wool on hand at the date of the assignment.

Rawson produced three notes, representing the balance claimed to be due the Union Trust Company,— one dated May 17, 1888, payable in sixty days, for $8000; one dated June 16, 1888, payable in thirty days, for $4000; and one

dated June 30, 1888, payable in thirty days, for $7500,—and in addition to these he claimed an indebtedness of $3100, on account of an over-draft. In his direct examination, Rawson testified that the amount due on the drafts produced had not been paid, and that it was embraced in the promissory notes produced, but on subsequent examination he showed that in reality he did not know whether this was true or not. He testified that when the trust company paid the drafts it took the notes of Hall & Co. for the money thus paid, but never for the exact amount, the amount of the note always being larger than the amount of the draft. These notes the trust company would discount, and carry the proceeds as a deposit into the account of T. W. Hall & Co. with the trust company. Hall & Co. would draw checks, and have the trust company certify them, and the trust company would then deduct the amount of such checks from the total of the deposit balance. Rawson further testified that in 1887 the trust company may have discounted the paper of the Halls, and loaned them money outside of the wool transactions, and that the amount of such discounts went to their general account, just as it did when they loaned on wool. The indebtedness of Hall & Co. to the trust company, at some times during the summer of 1887, ran from $140,000 to $160,000, and their average line of credit during that time ran from $60,000 to $70,000. After the making of the contract, in June, 1887, the trust company received from Hall & Co. sixty-three promissory notes, aggregating $674,688.34, all of which were paid before the assignment was made. Two were payable on demand, the others at stated periods after date,—most of them thirty or sixty days. None of the notes paid or produced correspond in dates with the drafts produced. Some of these notes are renewals of others, and they represent advances and loans of all kinds to Hall & Co. He says: "I think we advanced to pay drafts to the amount of about $80,000 in 1887. There was about fifty to sixty thousand, which would not include the Ayres & Fell."

And again: "We claim now $19,000 from T. W. Hall & Co. on account of this transaction. These notes which we now hold represent all amounts which we paid on account of drafts drawn against T. W. Hall & Co. These notes represent various shippers." He was then asked: "Does any part only represent the drafts of the Ayres & Fell transactions, or do they cover other drafts drawn by other parties?" He answered: "They are the extensions of notes from time to time. I could not say as to that identical draft."

Among the moneys advanced by the trust company after the contract in 1887, to Hall & Co., was an item of $10,000 to repay a loan to a Wisconsin bank. After speaking of a payment made to the trust company from the proceeds of wool sold subsequent to that advancement, the witness was asked whether that payment was applied on the $10,000, or on the other indebtedness of Hall & Co. He replied that they did not keep the accounts separate. The counsel then asked the witness: "So you don't know that the ten thousand that you advanced to pay the bank in Wisconsin is a part of the amount you now claim, or whether it has already been paid by T. W. Hall & Co. to you, do you?" He answered, "We have no knowledge to know for what specific wool a payment is made on."

No inference can be drawn that the account for advances upon specific wool was kept so as to be distinguishable from amounts advanced for other purposes from the fact that certain bills of lading were produced at the trial. These did not correspond either in date or amount with the notes produced, and Rawson admitted that the trust company still retained the possession of all of the bills of lading that had ever been delivered to it—as well those for wool that had been sold by Hall & Co. before the assignment, as those for wool in their hands at that time. It is quite evident that all that is here certain is, that there is the claimed balance due from T. W. Hall & Co. to the Union Trust Company. Confessedly, a part

of that general balance represents an over-draft and advances on wool for the year 1886, and no one claims that there can be any lien in favor of those amounts; and as to the residue, it is impossible to say how much represents advances on the faith of bills of lading for wool in the hands of the assignee. The rule is, "by commingling privileged claims with those for which there is no lien, so that the amount of the lien is not kept ascertainable without restating the accounts, the lien is impliedly waived." (*McMaster* v. *Merrick*, 41 Mich. 505; *Kelley* v. *Kelley*, 77 Me. 135; *Driscol* v. *Hill*, 11 Allen, 154; Jones on Liens, sec. 1023.) The burden was upon the trust company to prove the facts entitling it to a lien, and not upon the other parties to disprove its claim. It follows, that we concur with the Appellate Court in its decision upon the claim of the Union Trust Company.

*Second*—We also concur in the ruling of the county court and the Appellate Court, that Patterson Bros., Lienemann & Schmidt, Parberry, Grande Bros. and Kertz are entitled to liens, as held by those courts. This is so clear upon the evidence that no question is discussed in that respect in any of the arguments filed in this court, and it is therefore unnecessary to say more in regard to the claims of those parties. We likewise concur in the ruling of those courts that Vehmeyer is not entitled to a specific lien as claimed. His claim is based on a receipt issued by Hall & Co., who were not public warehousemen, and which was therefore of no more effect as a lien than a certificate issued by any other property owner. It is only where property is stored in a *public* warehouse that a receipt may be given which will evidence a lien upon the property. (Rev. Stat. 1874, chap. 114, sec. 118.) The Lincoln National Bank has neither appealed to this court nor assigned cross-errors here, but its claim seems otherwise to stand upon the same footing with that of Vehmeyer.

*Third*—The difficult question in the cause is in respect to the claims of the holders of receipts issued by the National

Storage Company. Both the county and the Appellate Courts found that they were entitled to liens upon the wool which went into the hands of the assignee, and they disagreed only as to whether the liens extended to the wool upon which the Union Trust Company claimed a lien.

The National Storage Company was incorporated in 1886, and among the objects expressed as the purpose of its incorporation is this: "To issue receipts or certificates for goods, wares or merchandise, and all personal property, except grain, to the owner or owners thereof, when such goods, wares or merchandise, or personal property, have been received, are on the premises, or under the control of the said corporation at the time of issuing such receipts or certificates." The company never had a warehouse of its own, but did business by taking leases of the owners of property of the buildings or places in which or where was stored the property for which receipts were to be issued, and then issuing to them warehouse receipts for the property. The evidently only purpose of each lease taken was to enable the company to say that the property for which the receipt was issued was in a building or place in which or where the company had possession.

T. W. Hall & Co. executed leases of different parts of its warehouse to the storage company from time to time, the first being on the 11th of June, 1887, and the last on the 29th of June, 1888, at which last period the leases included the entire second and third floors of their warehouse. The consideration for each of the leases was the nominal rental of five dollars, and each contained the following provisions:

1. "That said leased premises shall be used and occupied exclusively for the storage of goods, chattels and personal property.

2. "Said party of the second part, or its agent or agents, shall be permitted easy and convenient passage, at any and all times, through any part of the abutting premises that is

or shall be occupied or controlled by said parties of the first part, for the purpose of convenient access to the premises herein leased.

3. "It is further agreed that this lease may be canceled and the said premises leased herein be surrendered to said first party whenever all the storage warrants given by said second party to the said first parties shall have been taken up and canceled by said second party.

4. "It is further agreed that said parties of the first part may have use of such portion of the above described premises as shall not be occupied by said parties of the second part."

Hall & Co. retained the actual possession and control of their warehouse after the execution of the leases as before. The business of the storage company was under the immediate control of one Stephens, its secretary and manager, and he had three helpers and an office boy under him. After the execution of the first lease, T. W. Hall & Co. addressed the following to the storage company:

"CHICAGO, *June 13, 1887.*
"*National Storage Company, Chicago:*

"We have placed upon premises leased to you twenty-six thousand (26,000) pounds unwashed Montana wool, for which please issue us warehouse receipts.

"Yours truly,        T. W. HALL & Co."

Stephens testified: "On receipt of this letter I visited the premises to see if the wool was there. I found the wool on the third floor of Nos. 50 and 52 Dearborn avenue. Then I went back to the office of the storage company and made out a document. This document was signed by C. R. Cummings and W. G. Stephens. C. R. Cummings was then president of our company." The document is as follows:

*"Paid-up Capital, $100,000.*

"No. 143.                Received 26,000 unwashed wool.

*Warrant.*

"NATIONAL STORAGE COMPANY,
    Office, Room 54, Montauk Block,
                115 Monroe St., Chicago.

"Hereby acknowledge to have received twenty-six thousand pounds unwashed wool, said to be Montana wool, and will deliver the same to the order of T. W. Hall & Co., at its warehouse No. 18, at 46-48 Dearborn ave., upon payment of storage and charges, and the surrender of this warrant, properly endorsed. It is agreed that the company is not responsible for loss or damage to property occasioned by fire, water, leakage, vermin, ratage, accidental or providential causes, riot or insurrection, frost or change of weather, or from being perishable, while in its custody. Storage payable January 1, April 1, July 1 and October 1.

NATIONAL STORAGE COMPANY.

[*Seal.*]                C. R. CUMMINGS, *President.*

W. G. STEPHENS, *Secretary.*

Countersigned.—AUG. BLUHM, *Treasurer.*

"CHICAGO, *June 13, 1887.*"

Stephens then delivered the receipt to T. W. Hall & Co. Subsequently, and at different dates, numerous additional applications were made by Hall & Co., and corresponding receipts were issued to them by the storage company, varying from the foregoing only in amounts and dates, and that in some the words "said to be Montana wool" were omitted. These receipts were endorsed and negotiated by Hall & Co. immediately after being issued, the purchasers buying in good faith, without actual notice of any fact in derogation of the validity of the receipts.

On June 1, 1888, all the outstanding receipts were called in by the storage company, and others for like amounts issued. This resulted in the substitution, in the hands of the several parties, in place of the receipts of prior dates, of receipts of

that date, and all the receipts of that or subsequent date are like the one set out *supra*, except that in the later receipts were incorporated the words "lot A," "lot B," "lot C," or "lot D," and that all but one are simply for "unwashed wool." The designation lots "A," "B," "C" and "D" do not point out separate piles or lots of wool of a specific quantity or quality, but merely wool in a particular room of the warehouse,—the four rooms thereof having been, prior to this re-issue of receipts, designated as "A," "B," "C" and "D," respectively, and so "lot A" only means wool in room "A."

At the time of the assignment there were in the warehouse but 318,683 pounds of wool, yet warehouse receipts had been issued by the storage company to Hall & Co., and negotiated by them, for 408,550 pounds of wool. Stephens testified, that, upon the receipt of an application for a warehouse receipt, and before issuing, he either went in person to the warehouse or sent one of his helpers there, to see that the quantity of wool for which the receipt was desired was there; but it is admitted that in no instance was any wool weighed, or any wool set apart as the wool included in a particular receipt. Stephens said: "For the 26,000 pounds named in the first receipt there was no 26,000 pounds of wool allotted off or piled up at any time. At that time I picked out no particular pile on that receipt. I did not pick out any particular pile under the second receipt, nor under the third. I did not pick out any particular pile of wool on any receipt. The receipts did not refer to any particular pile. I could not have taken any one of those receipts and gone to the wool house and picked out a particular pile as referred to. No one could have taken any particular receipt of ours, and gone over to the house and picked out any particular pile of wool to which it referred. No receipt holder could go there and point out any particular quantity of wool, and say to Hall, 'Deliver me that wool; that is the wool referred to in this receipt.' None of the receipts that are outstanding or that we issued at any time to the Halls

referred to any specific wool, except in the way that I have stated—that they referred to portions of wool in portions of those premises."

The wool in the warehouse when the different receipts were issued, was chiefly from Oregon and Montana, though there was a small amount from other States. The evidence shows that the wool from each State differs, to some extent, in quality and value, and especially is this so with respect to Oregon and Montana, and in each State the wool is graded, for purposes of market, into several (some witnesses say a half-dozen) different grades; and it is shown that this wool, when sold by the assignee, varied in price, according to grade, from ten to twenty cents per pound. Indeed, some, graded as "sweepings," sold for only five cents per pound.

The evidence shows that Stephens, or one of his helpers, visited the rooms of the warehouse as often as once or twice a week, during business hours, and looked around to satisfy themselves what wool was on hand, but they never assumed to take actual control of either of the rooms, or to interfere with Hall & Co.'s control and conduct of the warehouse in any respect. Stephens permitted Hall & Co. to make sales of large quantities of wool, from time to time, upon their assurance that an equal or larger amount of wool was brought into the warehouse to take the place of that sold. He said: "The way it started originally was, that if a receipt mentioned so many thousand pounds in room C, that receipt would not refer to wool in any of the other three rooms, but to wool in that room C. Afterward there was a change. When they made a sale they asked our permission to drop it down to the room in which the press was located. If, when our first receipts were issued on wool in room A, there were 100,000 pounds of wool there in sacks, the Halls would have a right, without our permission, to remove from that room any portion of the whole 100,000. There was no particular 90,000 pounds of a given 100,000 in a room set apart to answer our receipts.

We claimed the right out of the 100,000 to take 90,000, or whatever the receipts called for.   Our rule for the company's agent was, that we should have five or ten per cent more wool than what the receipts called for, in trust, but they could remove the excess beyond the amount named in the receipts, plus the five to ten per cent margin, without asking us,—they could remove any part of the 100,000 pounds.   If there was 100,000 pounds at the time we issued the first receipt to the Halls for 26,000 pounds of wool, in the south room on the third floor, the Halls, without asking our permission, could remove 70,000 pounds of that wool,—any 70,000 they saw fit. This applies to all the rooms, if there was an excess as large as just mentioned.   It applies to all the wool on which we purported to issue receipts."   Again he said: "We never weighed the wool when we issued a receipt.   The general method that I have just been explaining in regard to the south room of the third floor (room C) applies to the other rooms, to all the wool, and to all the receipts.   When I went over there to look at the wool upon which I afterward issued a receipt, I did not mark those wools in any way, by signs or tags."

In other parts of the evidence it is shown that neither Stephens nor his helpers had any experience or special knowledge in handling wool, and that neither of them could distinguish between qualities or grades or values, nor determine quantities of wool, with any certainty, by a mere casual examination such as they gave to this wool.

It is contended on behalf of the storage company, that signs were put up by the storage company in and about different parts of the warehouse, as its receipts were issued, notifying the public that the storage company had possession; but the clear preponderance of the evidence is, that such signs were not put up and kept up in such a way as to advise those dealing in the wool with the Halls, of any claim of possession on behalf of the storage company.   Several dealers in wool, and purchasers of large quantities of this wool, testify that at dif-

ferent times after the first receipts of the storage company
were issued, they were in every room in the warehouse, and
examined every pile of wool in each room, and saw no signs
claiming anything on behalf of the storage company.  Several
of them were in and about the rooms of the warehouse, exam-
ining wool, as often as once or twice a week between June,
1887, and the date of the assignment; and two of them were
there at different times,—each as long as eight or ten days in
succession,—during all the business hours of each day, assort-
ing and sacking wool, and some of the wool which they assorted.
was obtained from each room, and neither was informed by
persons, nor did either see signs to the effect, that the storage
company claimed any possession there.

The Halls delivered the keys of the warehouse to Kinsey,
the assignee, on the 19th of July, 1888.  He immediately, on
that day, discharged all their employes, locked up the ware-
house, and employed Hiram Hall, who had been an employe
of the firm, as a clerk.  On the next day Stephens called, in
company with a wool broker, and obtained permission of Kin-
sey for them to go through the ware-rooms and look around.
While Stephens was in the ware-room one of his helpers came
to the warehouse, and, under pretense of wishing to commu-
nicate with Stephens, obtained permission of Kinsey to enter.
After he entered, Stephens directed him to remain as custo-
dian of the wool for the storage company, and he thereupon
scattered about the rooms signs claiming possession for the
storage company.  Kinsey threatened to eject the helper by
violence, and thereupon it was agreed between Kinsey and
Stephens that a custodian, mutually selected, should be in
possession, subject to the order of the county court as to the
rights of the parties, and such custodian then took actual pos-
session, and retained it until he was directed by the county
court to surrender to the assignee.

The constitution of the State, in section 1 of article 13,
provides:  "All elevators or storehouses where grain or other

property is stored for a compensation, whether the property stored be kept separate or not, are declared to be public warehouses;" and section 6 of the same article makes it the duty of the General Assembly "to pass all necessary laws to prevent the issue of false and fraudulent warehouse receipts." The General Assembly, in the Public Warehouse act of 1871, (Rev. Stat. 1874, p. 820,) has enacted that public warehouses shall be divided into three classes, designated as "A," "B" and "C," respectively. Classes "A" and "B" embrace warehouses where grain is stored in bulk, and class "C" embraces all other warehouses or places where property of any kind is stored for a consideration. Section 24 of the act provides: "Warehouse receipts for property stored in any class of public warehouses as herein described, shall be transferable by the indorsement of the party to whose order such receipt may be issued, and such indorsement shall be deemed a valid transfer of the property represented by such receipt, and may be made either in blank or to the order of another." Said section also requires that "all warehouse receipts for property stored in public warehouses of class 'C' shall distinctly state on their face the brand or distinguishing marks upon such property." Section 25 of the act provides that "any warehouseman of any public warehouse who shall be guilty of issuing any warehouse receipt for any property not actually in store at the time of issuing such receipt, * * * shall, when convicted thereof, be deemed guilty of a crime, and shall suffer, in addition to any other penalties prescribed by this act, imprisonment in the penitentiary for not less than one nor more than ten years." And section 170 of the Criminal Code provides, that "whoever fraudulently makes or utters any receipt or written evidence of the delivery or deposit of any grain, flour, pork, wool, salt or other goods, wares or merchandise * * * in any warehouse, * * * when the quantity specified therein has not in fact been delivered or deposited, as stated in such receipt or other evidence of the delivery or deposit thereof, and is

not, at the time of issuing the same, still in store, and the property of the person to whom or to whose agent the receipt is issued, shall be imprisoned," etc. 1 Starr & Curtis' Stat. 789.

To the existence of a pledge, the possession, either actual or symbolical, by the pledgee, of the personal property which is the subject of the pledge, is absolutely essential. Ordinarily, actual and physical possession of the property is delivered to and retained by the pledgee; but where the actual delivery is to a carrier or warehouseman, and a bill of lading or warehouse receipt is given therefor, the assignment or transfer of such bill of lading, or indorsement of such warehouse receipt, with delivery thereof to the pledgee, is regarded in law as the delivery of possession to the pledgee of the property which the instrument represents, the bill of lading or receipt standing in the place of the property of which it is the symbol. (*Taylor* v. *Turner,* 87 Ill. 296; *Michigan Central Railroad Co.* v. *Phillips et al.* 60 id. 190; *Burton* v. *Curyea,* 40 id. 320; *Canadian Bank* v. *McCrea et al.* 106 id. 281.) But it is a necessary condition to the existence of such symbolical possession by the pledgee that the property itself is in the possession of some person or corporation other than the pledgor. Here the indorsements and transfers of the supposed warehouse receipts to the receipt holders were ineffectual to constitute them valid and legal pledges of the wool to secure the debts for which they were hypothecated, and this, both because the National Storage Company did not have possession and control of the wool, and because the wool mentioned in each receipt was not so set apart and distinguished from other wool as that it could have been found and identified by the receipt. The storage company was not, under the law, authorized to issue warehouse receipts.

It is insisted, however, that on July 20, 1888, an employe of the storage company reduced to possession the property covered by the receipts, and that by virtue of such possession

the warehouse receipts became, in the hands of the receipt-holders, valid and subsisting pledges of the property. It would seem that the pleadings in the case substantially admit that the assignment to Kinsey became and was, on July 19, 1888, a valid voluntary assignment of the firm of T. W. Hall & Co., and that no question to the contrary was made in the trial court. But assuming this to be otherwise, and also assuming that the record does not show that on the day last named such a crisis had arisen in the affairs of the firm as authorized the partners present to make a valid and binding general assignment in the absence of one of the partners and without his consent or authority, and that the subsequent ratification on July 21, 1888, of T. W. Hall, could not operate to divest any rights acquired in good faith after the execution, recording and filing of the original instrument on the 19th, and before the ratification on the 21st, yet we think that the possession taken by the storage company on the intervening 20th day of July was of such a doubtful and unsatisfactory character that it can not be held to form the basis of a legal right or title. Two different persons can not, in the nature of things, each be in the actual and adverse possession of the same property or premises at one and the same time.

It is admitted that on the 19th certain of the partners in the firm of T. W. Hall & Co. assumed to transfer the property and title to Kinsey, and surrendered the possession of both the warehouse and the property therein to him; that thereafter, and until the afternoon of the next day, he was in the actual and exclusive possession of the warehouse and its contents, under a claim of ownership and title, and had possession and control of the keys. It is also admitted that on the afternoon of the 20th an agent of the storage company obtained, by a ruse, admission to the warehouse and to the second and third stories thereof, and immediately claimed possession for the storage company, and distributed a number of paper signs with the words, "Stored by National Storage Company," etc.,

printed upon them. It is to be borne in mind that all this time the assignee and his clerk still remained in the warehouse, and claimed exclusive and adverse possession of it and of all its contents, and had possession and control of the keys. A threat was made to throw the agent of the storage company out of the building, and thereupon, at the suggestion of some one, and for the evident purpose of preventing a breach of the peace, the parties agreed to leave a third person in possession until an order of the county court in the premises, and without detriment to the rights or claims of either party. This possession of the employe of the storage company was, in our opinion, of too questionable and unsubstantial a nature to support the claim made by the company and its receipt holders in that behalf.

It is, however, insisted, that even if there was no valid legal pledge of the wool which was in the warehouse at the time of the assignment, yet that, under the circumstances of the case, the holders of the warehouse receipts are entitled to an equitable lien thereon, which, although not recognizable at law, a court of chancery will enforce. A principal distinction between an equitable lien upon personal property and one upon such property which the law will recognize, is, that an equitable lien is not conditioned upon the possession of the fund or specific property to be charged with the payment of the particular debt. T. W. Hall & Co. borrowed from the receipt holders of the storage company various sums of money, which amounted, in the aggregate, to $54,253.38, and executed to them, severally, their promissory notes, and undertook to secure each of them by the indorsement and hypothecation of warehouse receipts. These receipts were issued by a duly incorporated storage company, and expressly stated upon their faces that the company had received and was in possession of the number of pounds of "unwashed wool" designated in the several respective receipts, and some of the receipts stated that the "unwashed wool" therein specified was "lot A," some that it was;

"lot B," some that it was "lot C," and some that it was "lot D:" The receipts, upon their faces, indicated that the storage company had complied with the law, by separating the wool into separate lots, and that "A," "B," "C" and "D" were the "brands or distinguishing marks" upon the respective lots of wool. The receipt holders were without notice of any fact in derogation of the validity of their receipts. There was an intention and an ineffectual attempt to secure the repayment of the borrowed moneys by creating valid legal pledges. Equity regards that done which ought to be done.

The difficulty in the matter is in respect to the identification of the wool mentioned in each of the receipts. The rule is, that it is indispensable to an equitable lien that the property intended to be charged should be identified or described with a reasonable degree of certainty. As we have already seen, no receipt holder could point out any particular quantity of wool, and say, "that is the wool referred to in this receipt." The assignee took possession of the warehouse and wool on the 19th day of July, 1888. At that time only 318,000 pounds of wool were stored upon the second and third floors of the warehouse. The outstanding receipts issued by the storage company, and which were held as collateral security by the receipt holders of that company, called for 404,550 pounds. It was then for the first time ascertained by said holders of receipts, that the marks "lot A," "lot B," "lot C" and "lot D," which appeared upon the faces of their receipts, did not refer to separate and specific lots of unwashed wool, upon which had been placed the distinguishing marks indicated in the respective receipts, but that said marks referred in fact to room A, room B, room C and room D, respectively. It further turns out that the unwashed wool which was in these several rooms at the time of the assignment was not the identical wool which was in said several rooms at the respective dates when the receipts were issued or indorsed and transferred, but that, from time to time, T. W. Hall & Co. had

removed wool from each of the rooms and had substituted other unwashed wool therefor.

Let us suppose that on said 19th day of July, 1888, no assignment had been made or attempted. Let us further suppose that at that date the six holders of receipts issued by the storage company to T. W. Hall & Co., and by that firm delivered to said several receipt holders as security for moneys lent and advanced, had exhibited their bill in equity against said T. W. Hall & Co., for the purpose of enforcing equitable liens upon the unwashed wool then stored in said rooms A, B, C and D. It is to be noted that the holders of the receipts stand upon a very different footing from that upon which the National Storage Company stands. They were entirely ignorant of the illegal arrangements which were entered into between that company and the firm of T. W. Hall & Co. in respect to possession, substitution, etc., and they stand before the court in the attitude of the victims of the frauds which it is the intention of the statute to guard against. It is better that the intention of the statute should prevail, if such result can reasonably be effectuated, than that the object which the statute has in view should fail of accomplishment. In the supposititious suit stated, T. W. Hall & Co. would be estopped, in a court of equity, from saying that lots "A," "B," "C" and "D" were not synonymous with the wools stored in rooms A, B, C and D, and from saying that the unwashed wool in said rooms at the time of filing the bill was not the same unwashed wool which was in said rooms when the receipts were issued and negotiated, or was of a different grade, quality or value. If the event had been that there was a larger quantity of wool in said rooms, or in one or more of them, than was called for by the receipts, then a different question would be presented, and probably it would devolve upon the receipt holders to distinguish the wool covered by the receipts from that not covered by them. But under the circumstances here shown, and the wool on hand being more than 86,000 pounds less than that

called for by the receipts, the firm would be estopped from saying that all of the wool on hand was not subject to the liens of the receipts. It is true that it is not possible here to definitely ascertain and identify just what specific part or parcel of the wool is subject to the claim of each of the six receipt holders, respectively. Were the litigation between the several receipt holders, such identification would be necessary. But in a suit wherein the value or proceeds of the property is confessedly much less than what would be required to satisfy the liens upon it, and wherein the firm is estopped from denying that all of the property is subject to the liens, and wherein the lien holders are content to take a decree for the proceeds *in solido,* to be divided between them "as their several rights may hereafter appear," it is not perceived that the firm would have any such interest in the matter as would authorize them to object to the absence of such identification of such specific parts or parcels. If the property covered by the receipts had been six hogsheads of sugar, one hogshead in each receipt, and one receipt held by each of the six receipt holders, and each hogshead insufficient in value to satisfy the debt against it, and there were no marks upon the hogsheads to distinguish one from another, it is not reasonable, or just or equitable, that because the firm had fraudulently omitted to put upon the hogsheads distinguishing marks which they represented to be upon them, or had fraudulently obliterated the distinguishing marks therefrom, therefore all the hogsheads should be awarded to the firm, free from any lien whatever. In the case under consideration, the expression "unwashed wool," found in each of the receipts, is broad enough to include, and when taken in connection with the use made of the letters A, B, C and D, and as against T. W. Hall & Co. themselves, is specific enough to sufficiently identify the wool which is the subject of the trusts. The circumstance that the property called for by the several receipts is inextricably intermingled, so that the specific parts thereof can not with certainty be

identified as belonging to each particular receipt, is owing to their false assurances and their own unlawful conduct, and it would be inequitable and unjust that they should profit thereby.

It is conceded, that in order to support an equitable lien there must be an ascertainment and identification of the property which is the subject of the lien; but only such an identification is required as is essential to an enforcement of the lien, and an identification can be made as well by an application of the equitable principle of estoppel as in any other way. It is believed that the case of Sir Simeon Stewart, which was approved by Lord Chancellor REDESDALE in *Card* v. *Joffray*, 2 Sch. & Lef. *374, (at *381, *382,) and also cited with approval in *Burn* v. *Burn*, 3 Ves. Jr. 573, and the cases of *Payne* v. *Wilson*, 74 N. Y. 348, *Bank of Rome* v. *Haselton*, 83 Tenn. (15 B. J. Lea,) 216, and *Call* v. *Gray*, 37 N. H. 428, are authorities which sufficiently sustain the views herein expressed in regard to the identification of the property.

In the case we have stated, we have put the matter as between the receipt holders and the debtor firm; but the equities do not stand otherwise as between said receipt holders and the assignee. The settled doctrine is, that when property is assigned by debtors for the payment of the debts of the assignors, the assignee takes it as a volunteer, and subject to all the liens, equities and burdens to which it was subject in the hands of the assignors. *Willis et al.* v. *Henderson*, 4 Scam. 13; *Talcott* v. *Dudley*, id. 427; *Strong et al.* v. *Clawson*, 5 Gilm. 346; *O'Hara* v. *Jones*, 46 Ill. 292; *Hardin* v. *Osborne*, 94 id. 571; *Jenkins* v. *Pierce*, 98 id. 646. This principle is recognized in section 11 of the Voluntary Assignment act of 1877, wherein it is provided, "that any assignee or assignees * * * shall have as full power and authority to dispose of all estate, real and personal, assigned, as the debtor or debtors had at the time of the assignment, * * * and generally to act and do whatsoever the said debtor or debtors might have done in the premises." The general rule is, that an equitable lien

is enforceable against voluntary assignees. 13 Am. and Eng. Ency. of Law, 608, and cases cited in note 3.

There is no mode under our law, except by chattel mortgage duly acknowledged and recorded, by which the owners of personal property retaining its possession can give another a lien upon it that can be enforced as against creditors and subsequent purchasers. But by "creditors" is meant, not general creditors or creditors at large, and only such creditors as are armed with an execution or writ of attachment, or other process of court, are regarded as "creditors," in the sense that they are authorized to impeach a conveyance or transfer of property by their debtors for fraud, or question the validity of an equitable lien on personal property that is good as against such debtors themselves, and their heirs, executors, administrators and voluntary assignees. *Warner* v. *Jameson*, 52 Iowa, 70 ; *Van Heusen* v. *Radcliff*, 17 N. Y. 580 ; *Walker* v. *Miller*, 11 Ala. 1067 ; *Taylor* v. *Wheeler*, 2 Vern. 564 ; *Mitchell* v. *Winelow*, 2 Story, 630. In Powell on Mortgages, 459, it is said : "It is a general rule, that whenever a right in equity attaches against a person, that equitable right binds all persons claiming under or against that person who have not special liens on any of the property, and hence it follows that general creditors are in all cases bound by a particular equity."

It is a settled fact of this case that Patterson Bros., Parberry, Lienemann & Schmidt, Grande Bros. and Kertz had special rights and equities in and liens upon some portions of the wool which was stored on the second and third floors of the warehouse, and upon which the receipt holders claimed liens, the rights of said parties first named growing out of shipments made by them of wool to T. W. Hall & Co., as factors, but their rights, interests and equities in the premises were recognized and enforced, and given a priority by the decree entered in the county court, and affirmed, in that respect, in the Appellate Court, and they are not here complaining. It does not militate against the claims of the receipt holders

of the storage company, so far as their claims of equitable liens are chargeable upon wool which was the property of T. W. Hall & Co., that that firm also assumed to give them liens upon other wool which was not their property, but merely in their hands as factors of the owners.

Since, then, there are no creditors here who are in a position to take, by virtue of executions or process emanating from a court, the property in the hands of the assignee which was awarded to said receipt holders, and no objecting creditors who have valid special liens on any part of such property, we hold that the order and judgment of the Appellate Court were right, and they are affirmed.

*Judgment affirmed.*