# Home Savings & State Bank v. Charles R. Wheeler, Assignee, etc.

1. Assignee—*Agent of the Assignor.*—An assignee for the benefit of creditors is not the representative of the creditors, but is the agent of the assignor for the distribution of the property assigned.

2. Same—*What the Assignment Passes—Previous Fraudulent Transfers.*—The assignment does not pass to the assignee any interest in property previously fraudulently transferred by the assignor, nor any right to impeach or set aside such fraudulent transfers.

3. Voluntary Assignments—*What Title the Assignee Takes.*—An assignee under the insolvent act takes no greater interest or better title than his assignor possessed. His title is affected with every infirmity, and subject to every defense and to every equity that existed in respect thereto in the hands of the assignor. He takes the assignment as a volunteer and subject to every burden which rested upon the property assigned in the hands of the assignor, and can do only that which the assignor could have done.

4. Same—*Powers of the Assignor as to Contract Rights—Secret Liens.* —The assignor takes the property assigned subject to liens and contract rights which are not of record, and of which he has no notice, and has no greater right to recover property by litigation than the assignor would have had if no assignment had been made, and there are no equities, presumptions or rules in his favor except such as would have been equally available to the assignor in the absence of an assignment.

5. Same—*An Assignee has no Greater Rights than the Assignor— Estoppel.*—When an insolvent debtor would be prevented by the rules of law from recovering property disposed of previous to making an assignment, his assignee can not do so. What creates an estoppel against the assignor, creates also an estoppel against the assignee.

6. Corporations—*Assent, When to be Inferred.*—The acts and assent of corporations like those of individuals may be shown and inferred from facts and circumstances.

7. Same—*Notice to Officers Binds.*—Notice to a director or managing officer of a corporation about the business of the corporation while he is engaged in its business in the line of his authority, binds the corporation.

8. Same—*Dealings with Third Parties.*—Third parties who deal in good faith with a corporation must be protected in a reliance upon what its officers do or omit to do; their conduct must bind the corporation where an individual would be bound by his own conduct.

Replevin.—Appeal from the Circuit Court of Peoria County; the Hon. Thomas M. Shaw, Judge, presiding; finding and judgment for plaintiff

under a count in trover for $5,041.98. Heard in this court at the December term, 1897. Reversed and remanded. Opinion filed February 28, 1898.

### STATEMENT OF THE CASE.

Appellee, as the assignee of Singer & Wheeler, brought this suit in replevin against the Home Savings & State Bank to recover warehouse certificates for 220 barrels of whiskey, and also to recover said barrels of whiskey. The property was not obtained upon the writ, and plaintiff filed a declaration in replevin with a count in trover. There were pleas of *non cepit* and *non detinet* to the counts in replevin, and not guilty to the count in trover, and a trial without a jury, resulting in a finding and judgment for plaintiff under the count in trover for $5,041.98. This appeal is from that judgment.

Singer & Wheeler was a corporation organized in 1883 and engaged in the wholesale drug business, having a capital stock of $250,000, and doing a business of nearly one million dollars a year. It had a board of three directors. From about the time of its organization Peter J. Singer was director, treasurer and general manager, and in 1887 was also made president. W. A. Singer was director and secretary from 1887 to 1896, and W. A. Barker was the other director from 1888 to 1896. Until September 24, 1895, long after the transactions here litigated, the corporation had no by-laws, and had never taken any recorded action defining the duties or limiting the authority of its officers. It held directors' meetings only about once a year, and Barker attended no oftener, and took no part in the conduct of its business. All the business was done by P. J. Singer and W. A. Singer. Motions and resolutions at formal directors' meetings were seldom adopted, and a record of such action was seldom entered. These formalities were only observed on rare occasions. Usually its directors and officers kept no record of their official action.

On April 18, 1893, the company borrowed $5,000 of the bank and gave its note for that sum, and pledged warehouse certificates for 275 barrels of whiskey as collateral

security therefor.   On September 14, 1893, all but $1,000 of that note had been paid.   Before that time P. J. Singer had on two occasions borrowed from said bank on his own note $5,000, and had pledged shares of stock in Singer & Wheeler to secure said loans.   Said notes of P. J. Singer became overdue and officers of the bank asked payment, and P. J. Singer declared himself unable to pay, and anxious to renew them.   On one of these occasions he told a clerk of the bank that Singer & Wheeler owed him more than $10,000, and that he could pay his notes if it could pay him, but that it was in such a financial condition that he could not then withdraw that amount of money for his own use, and for that reason he could not pay the bank. The clerk repeated this to the vice-president of the bank, and the latter sought out P. J. Singer at the office of Singer & Wheeler, repeated to him what the clerk had told him, and asked, if that was true, why he could not take some whiskey or other merchandise from the company for his debt and put it up with the bank as collateral if he could not pay the money.   P. J. Singer said he could not do it, and the vice-president said he thought he could if he wanted to, and after some discussion P. J. Singer said he would see about it.   On September 14, 1893, P. J. Singer came to the bank and said he could make an arrangement, and had made an arrangement, and would put up the whiskey as collateral for his indebtedness.   The bank then prepared a new note for $10,000 on ninety days' time, with a collateral agreement showing the maker had deposited as security for said note said shares of stock and said warehouse certificates for 275 barrels of whiskey, and P. J. Singer signed said note and collateral agreement.

Six days later Singer & Wheeler paid the balance of its $5,000 note and took up the note, but did not repossess itself of said warehouse certificates.   Shortly thereafter an officer of the bank was changing the indorsement upon the envelope containing said securities, so as to show they were held as collateral to P. J. Singer's debt, instead of Singer & Wheeler's debt, when he noticed the certificates (which

ran to Singer & Wheeler) had not been indorsed by Singer
& Wheeler. An officer of the bank then took them to the
office of Singer & Wheeler and presented them to W. A.
Singer, its secretary, and asked him to indorse them. The
secretary said the bank had had them so long, why ask to
have them indorsed now. The bank officer replied that the
bank had been holding them as security for the note of
Singer & Wheeler, but now held them as collateral security
for the note of P. J. Singer, and they ought to be indorsed.
The secretary then indorsed each of said certificates in blank
in the name of the corporation, by himself, as its secretary,
and at the trial he testified that he indorsed said certificates
so that the bank could hold them as collateral for P. J.
Singer's note. While the secretary was indorsing said cer-
tificates something was said about the bank having carried
them so long, and the secretary said they would have paid
them sooner had Singer & Wheeler been able to spare the
money out of its business. The secretary then redelivered
said certificates to the officer of the bank so indorsed by
Singer & Wheeler.

At one time thereafter the secretary went to the bank
and took up one certificate for five barrels of whiskey and
left in its place another certificate for five barrels of rye
whiskey, also indorsed in blank by Singer & Wheeler by
its said secretary. Twice afterward the government tax
came due on portions of said whiskey and it became neces-
sary to pay the tax and storage charges and take the whiskey
out of bond, and Singer & Wheeler requested the bank to
advance the money to pay this tax, and it did so advance
$2,956.90 at one time, and $2,933.70 at another time, to pay
said taxes. After all this had been done the bank renewed
the note of P. J. Singer, taking from him a new note for
$10,000, due one day after date, with a like collateral agree-
ment pledging the same stock and warehouse certificates
for its payment. On the day of such renewal, June 23,
1894, Singer & Wheeler gave the bank its note for $5,956.48,
to cover the amounts the bank had advanced for said taxes
and interest thereon. This note also had a collateral agree-

ment attached thereto pledging as security for its payment warehouse certificates for 150 barrels of whiskey, being part of the same certificates already referred to. Afterward (apparently by, or by the direction of Singer & Wheeler or P. J. Singer, its president and manager) part of said whiskey was sold, and from its proceeds Singer & Wheeler's note for $5,956.48 was paid, and the balance arising from said sale, $3,080.84, was credited on the $10,000 note of P. J. Singer. Singer & Wheeler in some way withdrew five barrels of whiskey from the warehouse without the certificate. The bank sold the shares of stock pledged and applied them on said note, and holds the rest of the certificates as security for a balance still due it from P. J. Singer on his said note, which balance exceeds in amount the value of said whiskey.

All the foregoing transactions occurred while Singer & Wheeler was a going concern, and they were never questioned by Singer & Wheeler or any of its officers. Afterward, on January 10, 1896, Singer & Wheeler made an assignment to appellee for the benefit of creditors. In March, 1896, the assignee made demand on the bank for said certificates, and on refusal brought this suit. The judgment below is for the value of all the whiskey pledged with the bank, less the amounts it paid for taxes and interest thereon.

DAN F. RAUM and NICHOLAS ULRICH, attorneys for appellant.

All business of a corporation is done through its agents, and private trading corporations have the right to employ or appoint agents and servants for the transaction of their commercial business to the same extent as natural persons. 4 Thomp. on Corp., Sec. 4874.

In the appointment of agents and in the implications of authority, corporations are governed by the same rules and the same inferences as exist as to natural persons. St. Louis, Alton & Chicago Ry. Co. v. Dalby, 19 Ill. 375; Ashley Wire Co. v. Illinois Steel Co., 60 Ill. App. 179; Union Mut. Life Ins. Co. v. White, 106 Ill. 67; McDonald v. Chisholm, 131 Ill. 273; Edwards v. Thomas, 66 Mo. 468.

A private trading corporation has the power to dispose of its commercial assets by way of pledge or mortgage, or other security, for any debt it may lawfully contract. Leo v. Union P. R. R. Co., 17 Fed. Rep. 273; Platt v. Union P. R. R. Co., 99 U. S. 48.

The general manager of the business and affairs of a trading corporation, in whose hands the entire management of the affairs of the corporation is permitted to be placed, may, without other authority from the board of directors, pledge its commercial assets for the debt of the corporation. 4 Thomp. on Corp., Sec. 4849.

The president of a solvent going corporation, who is also its general manager, acting in good faith, has the right to loan his money to such corporation, and take in like manner as a stranger its property, choses in actions, etc., in pledge, as collateral security for the money loaned by him to it, and the subsequent insolvency of the corporation will not affect his right to enforce such security. Mullanphy Savings Bank v. Schott, 135 Ill. 655; Illinois Steel Co. v. O'Donnell, 156 Ill. 633; Beach v. Miller, 130 Ill. 162.

Innocent strangers are not concerned with the rightful exercise by corporate agents of their powers, and corporations are responsible for the frauds of their officers and agents within the scope of their powers. 4 Thomp. on Corp., Secs. 4931, 4932.

Although the acts of an agent operate as a fraud upon the principal, yet if done within the scope of the agent's apparent authority, the principal will be bound as to third persons for the act. Harvey, Wolff & Co. v. Miles, 16 Ill. App. 533; Doan v. Duncan, 17 Ill. 272; Noble v. Nugent, 89 Ill. 522; Goeing v. Outhouse, 95 Ill. 346; St. Louis, etc., R. R. Co. v. Dalby, 19 Ill. 353.

The declarations and representations of an agent made in the execution and within the scope of his apparent authority, and in reference to business depending at the very time, will be binding upon the principal. 1 A. & E. Ency. Law, 1143 (2d Ed.)

WINSLOW EVANS, attorney for appellee.

A contract of pledge does not pass the property in the thing pledged; it only takes effect by delivery of possession to the pledgee. The pledgee only takes possession with right to retain and sell in case the debt secured is not paid when due. Union Trust Co. v. Rigdon, 93 Ill. 458; Jones on Pledges, Sections 1 to 8.

In a lien there is no power to sell, but only right to retain until the debt is paid. Jones on Pledges, Section 1 and note.

The delivery of a document title, which serves to put the pledgee in possession of the goods, is equivalent to the actual delivery of the goods, as a bill of lading, a warehouse receipt, etc. Jones on Pledges, sections 37 and 258; Dows v. National Exchange Bank, 91 U. S. 618.

In case of bailment where the bailee did not know that the bailor had no right to bail the goods, and where on demand he refused to give them up on the ground he had a lien on them for money and charges advanced, it was held a conversion even without demand. M'Combie v. Davies, 6 East, 538.

Directors of a corporation have charge of, and manage the assets of such corporation as trustees for the stockholders, and they have no right to use or appropriate the funds of their *cestui que trust* to themselves. They have no power to waste, destroy, give away or misapply them. Holden v. Lafayette, B. & M. Ry. Co., 71 Ill. 106; Beach et al. v. Miller, 130 Ill. 162.

Mr. Justice Dibell delivered the opinion of the Court.

The assignee is not the representative of the creditors, but the agent of the assignor for the distribution of the property. The assignment does not pass to the assignee any interest in property previously fraudulently transferred by the assignor, nor any right to impeach or set aside such fraudulent transfer. Bouton v. Dement, 123 Ill. 142; Hanford Oil Co. v. First National Bank, 126 Ill. 584. The assignee takes no greater interest or better title than his assignor possessed. His title to the assigned property is

affected with every infirmity and subject to every defense and to every equity that existed in respect thereto in the hands of the assignor. He may do that which the assignor might have done. Davis et al. v. Chicago Dock Co., 129 Ill. 180; Knights et al. v. Martin, 155 Ill. 486. The assignee takes the property as a volunteer and subject to every burden which rested upon it in the hands of the assignor. Union Trust Co. v. Trumbull, 137 Ill. 146. He takes, subject to liens and contract rights which are not of record, and of which he has no notice. Hooven O. & R. Co. et al. v. Burdette, Assignee, et al., 153 Ill. 672. Under these principles this assignee has no greater right to recover in this case than Singer & Wheeler would have had if no assignment had been made and it had brought this suit on March 26, 1896. There are no equities or presumptions or rules of evidence in his favor except such as would have been equally available to Singer & Wheeler if no assignment had been made and it had brought this suit. The question, therefore, is whether Singer & Wheeler would have had a right of action to recover the value of the whiskey under the facts in evidence.

We think the evidence does not tend to show any actual fraud or lack of good faith on the part of the bank in taking these certificates as security for P. J. Singer's note. There is nothing to show but that the bank officers honestly believed his statement when he told them Singer & Wheeler owed him more than $10,000, and that he could pay the bank if the company would pay him, but that its financial condition did not permit it to withdraw that amount of money from its business at that time. The vice-president did not urge him to do a dishonest act, nor to exceed his powers as an officer of Singer & Wheeler. The vice-president of the bank knew Singer & Wheeler had valuable whiskey certificates pledged for a note, four-fifths of which was paid. He might well suppose a concern doing a business of nearly a million dollars a year, would be likely to have other assets available as collateral. What the vice-president did urge upon P. J. Singer was that he get his

company to turn out to him on his debt whiskey or other merchandise, and then pledge that to the bank on the extension he was seeking. P. J. Singer after discussion said he would see what he could do, and on a later day returned and said he could make an arrangement and had made an arrangement, and would pledge the whiskey, and thereupon signed a new note on extended time and a collateral agreement pledging the whiskey as security therefor. What P. J. Singer said would be understood by the vice-president to mean that he had made an arrangement with Singer & Wheeler by which it had authorized him to take whiskey certificates either as payment or security on its debt of over $10,000 to him, and had obtained the right to pledge those certificates to the bank to secure his own debt. We see no reason to doubt that the officers of the bank believed these statements and acted in entire good faith in giving P. J. Singer an extension on the faith of said certificates.

But P. J. Singer was then transacting his own business and not that of Singer & Wheeler, and undoubtedly his declaration, favorable to himself and against Singer & Wheeler under these circumstances, did not bind Singer & Wheeler. But other events followed which both tend to create an estoppel against Singer & Wheeler (and therefore against its assignee) from disputing the validity of this pledge, and also tend to prove it is true Singer & Wheeler did owe such a debt to P. J. Singer, and did turn out to him or give him authority to pledge these certificates for his debt. Six days later Singer & Wheeler paid the last one thousand dollars on its note to the bank and took it up; but did not take up, and, so far as appears, did not claim or ask for its warehouse certificates. It left them with the bank. Whoever made the final payment and took up the note and left the certificates, was then engaged in the business of Singer & Wheeler with its authority, and that action was in harmony with P. J. Singer's previous statement to the bank. The bank officers would naturally understand the failure to take up the certificates as a confirmation of the statements of P. J. Singer. A very few days later an officer

of the bank took the warehouse certificates to the office of Singer & Wheeler and asked its secretary to indorse them so as to put the title in the bank, and told him the bank had held them as collateral to the Singer & Wheeler note, and now held them as collateral to the note of P. J. Singer. The secretary was an officer of the company and trusted by the company to transact its business, and was at the company's office where its books and accounts were kept, and was actively engaged in the company's business to which he gave all his time, and might justly be presumed by the bank to be fully conversant with Singer & Wheeler's affairs. He uttered not a word in denial or question of the right of the bank to hold these certificates as collateral to the note of P. J. Singer; he treated it as a matter of which he was fully advised; and at once, in the name of Singer & Wheeler, made the indorsement requested, and while doing so made a remark to the bank officer, which, though not very clearly expressed, would certainly be understood by that officer to mean that P. J. Singer's debt to the bank would have been paid before if Singer & Wheeler had been able to spare the money out of its business—plainly implying Singer & Wheeler did owe P. J. Singer enough to enable him to pay the bank if it would pay him. Still later the secretary presented at the bank a new certificate for five barrels of whiskey duly indorsed by Singer & Wheeler, and deposited it with the bank in the place of a certificate for five barrels which he took away. He was acting in the business of Singer & Wheeler and as its officer when he did this. He knew the bank held the certificate as collateral to P. J. Singer's debt; he recognized the bank's right to so hold it, and deposited another certificate to take the place as such security of the one he wished to withdraw. At two different times thereafter taxes and warehouse charges in large sums accrued. The first time the draft therefor was drawn directly upon the bank, and the second time it was drawn on Singer & Wheeler, and its secretary requested the bank to pay it. The bank had no interest in advancing this money except to protect said certificates as its own security for the note of P. J. Singer. The secretary of Singer &

Wheeler knew it would only advance the money to protect the certificates as its own security, and yet he requested the bank to so advance the money and it complied, and Singer & Wheeler afterward gave its note for said advance, and still later by its president sold or authorized the sale of what whiskey was sold, not only enough to pay said advance but over $3,000 more. Singer & Wheeler never asked that this surplus be paid to it, but the bank, without objection from Singer & Wheeler so far as appears, applied said surplus on the note of P. J. Singer.

Singer & Wheeler was a going concern and doing a very heavy business for about two years and four months after P. J. Singer pledged these warehouse certificates for his own debt. During all that time every act of Singer & Wheeler was in harmony with said pledging, and in apparent recognition thereof as a proper and authorized disposition of said certificates. If Singer & Wheeler had promptly repudiated the transaction the bank in turn could have repudiated the extension of ninety days it gave P. J. Singer on the faith of his right to make such pledge, and could have sued him and recovered judgment for its debt. It was lulled into security by the acts and acquiescence of the corporation above set forth. The necessities of business require that the public when acting in good faith may deal with officers of corporations in reliance upon the strength of their apparent power. Ashley Wire Company et al. v. Illinois Steel Company, 164 Ill. 149. The acts and assent of corporations, like those of individuals, may be shown and inferred from facts and circumstances. Louisville, N. A. & C. Ry. Co. v. Carson et al., 151 Ill. 444. Notice to a director or managing officer of a corporation about the business of the corporation while he is engaged in its business in the line of his authority binds the corporation. American Strawboard Co. v. Peoria Strawboard Co., 65 Ill. App. 502; Bartlett v. Woodbine Savings Bank, 57 Ill. App. 425. It will not do to say W. A. Singer was a son of P. J. Singer and liable to combine with his father in illegal acts, and therefore notice to him should not be treated as notice to the

company. The corporation put them both in their offices and kept them in control of its business with knowledge of their relationship, and it must be bound by notice to them and by their acts and omissions in and about the corporate business as it would have been bound by any other officers. If its officers did not act honestly toward it, it was the business of each director and of the stockholders to find it out and change its officers, and promptly repudiate their unlawful acts. Third parties who deal in good faith with a corporation must be protected in a reliance upon what its officers do and omit to do. The conduct of its officers must bind the corporation where an individual would be bound by his own conduct.

Viewed in this light, it is a serious question whether Singer & Wheeler and its assignee are not estopped by the acts, silence and delay herein recited, to now question the right of the bank to hold these certificates as security for P. J. Singer's note. As there may be other evidence which will throw light on this subject, we leave that question undecided, but we are of opinion that the facts and circumstances herein set forth are evidence tending to show Singer & Wheeler did owe P. J. Singer over $10,000 and did place these certificates in his control, either as payment or security to him, in such a way as authorized him to pledge them to the bank for his own debt. There is no presumption the officers of Singer & Wheeler violated their duty and defrauded the corporation by their conduct. The presumption must be that their acts were legal and that the facts were as they admitted and recognized by their conduct that they were, till the contrary appears. Singer & Wheeler and its assignee were presumably possessed of all the books and data to show its dealings with P. J. Singer and the state of his accounts with it. This evidence was not equally accessible to the bank. The fact that no record could be found of a directors' meeting at which he was authorized to pledge this stock for his own debt is deprived of all force when it is found they kept practically no such records. As plaintiff did not otherwise attempt to rebut the case made by the facts and cir-

cumstances stated we think the trial court should have found for defendant. The judgment will be reversed and the cause remanded for a new trial. Reversed and remanded.