## Charles R. Wheeler, Assignee, v. The Home Savings & State Bank.

1. Voluntary Assignments—*What Title Passes.*—The assignee under the insolvent act takes the property assigned affected with every infirmity, and subject to every defense and equity, which rested upon it in the hands of the assignor.

2. Same—*Contract Rights and Secret Liens.*—An assignee under the insolvent act takes the property subject to all liens and contract rights, although not of record and of which he has no notice, and he has no greater right to recover property by litigation than the assignor would have had, if no assignment had been made.

3. Ratification—*By Acquiescence.*—When a director, acting as the treasurer and general manager of a corporation, pledges a portion of its assets as collateral security for his individual debt, the acquiescence of the corporation in such action for a number of years will justify the inference that the pledging was with the consent of the corporation.

Replevin.—Trial in the Circuit Court of Peoria County; the Hon. Thomas M. Shaw, Judge, presiding. Finding and judgment for defendant; appeal by plaintiff. Heard in this court at the May term, 1899. Affirmed. Opinion filed October 12, 1899.

Winslow Evans, attorney for appellant, contended that P. J. Singer, in making the representations as to Singer & Wheeler owing him, and that he had made an arrangement and would pledge the warehouse receipts in question for his own debt, was acting in his own interest, and the bank had no right to rely upon them.

It was the duty of the bank to have made inquiry of other officers and agents of the corporation, Singer & Wheeler, as to the title and authority of P. J. Singer to deal with the warehouse receipts as proposed.

The bank is chargeable with notice of whatever such inquiry would have revealed.

Having taken the warehouse receipts without such inquiry, it held them subject to the right of the corporation, Singer & Wheeler. Germania Safety Vault & Trust Co. v. Boynton, 19 C. C. A. 118, 71 Fed. Rep. 797; Wilson v. M. E. R. Co., 120 N. Y. 145; Shaw v. Spencer et al., 100

Mass. 382; Bank of N. Y. N. B. Ass'n v. A. D. & T. Co., 143 N. Y. 559; Claflin v. Farmers' & Citizens' Bank, 25 N. Y. 993; Smith v. Immigration, etc., Ass'n, 78 Cal. 289; Wilbur v. Lynde, 49 Cal. 290; Garrard v. Pitts. & C. Ry. Co., 29 Pa. St. 154; Board of Education v. Sinton, 41 Ohio St. 504; Farrington v. South Boston R. Co., 150 Mass. 406; Moores v. Citizens' Nat. Bank of Piqua, 111 U. S. 156; Nat. City Bank v. Jaudon, 15 Wall. (U. S.) 165; Pendleton v. Fay, 2 Paige (N. Y.), 202; Park Hotel Co. v. Fourth Nat. Bank, 30 C. C. A. 409, 86 Fed. Rep. 742.

The act of P. J. Singer, in pledging the property of Singer & Wheeler to the bank to secure his individual debt, was *ultra vires*, and the act of W. A. Singer, after such pledging, in indorsing the name of Singer & Wheeler on the warehouse receipts, even if done for the purpose of aiding P. J. Singer in such pledging, was likewise *ultra vires* and void, and so known to the bank. Germania S. V. & T. Co. v. Boynton, 19 C. C. A. 118; Park Hotel Co. v. Fourth Nat. Bank, 30 C. C. A. 409.

The acts or declarations or course of dealings relied upon as waiver or estoppel must have been with full knowledge of all the facts. Bliss on Fire Insurance, Section 267.

There can be no waiver or estoppel in absence of complete knowledge of all the circumstances; and the fact that the assured, during the life of the policy, notified the company that the premises were vacant and received the reply "all right," will not amount to an estoppel, unless it also appears that the company was also made aware that the house was vacant a month before the policy was issued and had continued so ever since. Good faith and fair dealing required that all the facts should have been stated. Boyd v. Insurance Co., 90 Tenn. 212.

' Estoppels are not favored in the law, and an estoppel *in pais* is never allowed to be used as an instrument of fraud, but is to be resorted to solely as a means to prevent injustice; always as a shield, never as a sword. Pierpont v. Barnard, 5 Barb. (N. Y.) 364.

Where a party, with full knowledge of all the facts

creating the liability, acquiesces in what has been done, he thereby ratifies what has been done, and silence in such case, after a reasonable length of time, will amount to a ratification. 2 Hermann on Estoppel, Sections 768, 769.

It is scarcely necessary to say that a ratification, to be efficacious, must be made by a party who had power to do the act in the first place, and that it must be made with knowledge of the material facts. Western Nat. Bank v. Armstrong, 152 U. S. 346.

The doctrine of estoppel *in pais* will not be applied to a person who has been guilty of no fraud simply because, under a misapprehension of law, he has treated as legal and valid an act open to the inspection of all. Holcomb et al. v. Boynton, 151 Ill. 294–300.

DAN F. RAUM and N. ULRICH, attorneys for appellee.

Private corporations have the right to borrow money to carry on business and to give security therefor in any manner not prohibited by law, the rule being the same as with natural persons. Rockwell v. Elkhorn Bank, 13 Wis. 653; Ward v. Johnson, 95 Ill. 215.

A private trading corporation has the power to dispose of its commercial assets by way of pledge or mortgage, or other security, for any debt it may lawfully contract. Leo v. U. P. R. R. Co., 17 Fed. Rep. 273; Platt v. U. P. R. R. Co., 99 U. S. 48.

The general manager of the business and affairs of a trading corporation, in whose hands the entire management of the affairs of the corporation is permitted to be placed, may, without other authority from the board of directors, pledge its commercial assets for the debt of the corporation. 4 Thomp. on Corp., Sec. 4849.

The president of a solvent going corporation, who is also its general manager, acting in good faith, has the right to loan his money to such corporation and take in like manner as a stranger its property, choses in action, etc., in pledge as collateral security for the money loaned by him to it, and the subsequent insolvency of the corporation will not

affect his right to enforce such security. Mullanphy Bank v. Shott, 135 Ill. 655; Ill. Steel Co. v. O'Donnell, 156 Ill. 633; Beach v. Miller, 130 Ill. 162.

Corporations like Singer & Wheeler are private commercial enterprises, notwithstanding their form of organization; their form of corporate organization is permitted to them mainly to enable the stockholders to avoid individual liability for debts to which they would be exposed if not so organized, and the strict limitations that govern public corporations and their officers are not to be applied with the same strictness to private business corporations. Bradley v. Ballard, 55 Ill. 413.

All business of a corporation is done through its agents, and private trading corporations have the right to employ or appoint agents and servants for the transaction of their commercial business to the same extent as natural persons. 4 Thomp. on Corp., Sec. 4874.

Strangers dealing with a corporation are not required to know the provisions of its by-laws, but its officers and agents must be taken to have the authority which designations imply, and also those which they are permitted by the corporation to exercise. Home Life Ins. Co. v. Pierce, 75 Ill. 426.

When an agent acts within the scope of his apparent authority, though in excess of authority actually given, the other party having no notice of the limitation, the principal is bound. St. L. & Memphis Packet Co. v. Parker, 59 Ill. 23; U. S. Life Ins. Co. v. Advance Co., 80 Ill. 549.

Innocent strangers are not concerned with the rightful exercise by corporate agents of their powers, and corporations are responsible for the frauds of their officers and agents within the scope of their powers. 4 Thomp. on Corp., Secs. 4931–4932.

Although the act of an agent operates as a fraud upon the principal, yet if done within the scope of the agent's apparent authority, the principal will be bound as to third persons for the act. Harvey v. Miles, 16 Ill. App. 532.

As a general rule, a party will be concluded from denying

his own acts or admissions which were expressly designed to influence the conduct of another, and did so influence it, and when such denial will operate to the injury of the latter. Kinnear v. Mackey, 85 Ill. 96.

Acquiescence for a considerable time by a corporation, through its efficient agencies, and the body of its stockholders, in a state of facts after knowledge, or after such a length of time and such a condition of circumstance that knowledge is to be inferred, will operate as a ratification. 4 Thomp. on Corp., Sec. 5298, and cases cited.

MR. JUSTICE DIBELL delivered the opinion of the court.

This case, with the title reversed, was before us in 74 Ill. App. 261. Our statement of the case and our opinion then rendered very fully outlined the evidence and the law we held applicable to the facts. We here refer to that statement and opinion; and much that is there said we need not here repeat. After the cause returned to the Circuit Court, another trial was had without a jury, and the bill of exceptions of the evidence heard at the first trial was used as the evidence at such second trial; but with a stipulation between the parties, used in the place of further testimony; and the contents of that stipulation present the only difference in matters of fact between the former record in this court and the one now before us. In that stipulation it was agreed that on September 14, 1893, when P. J. Singer gave the bank his note for $10,000, and left said warehouse certificates as collateral therefor, Singer & Wheeler did not owe him anything, but he was then largely indebted to Singer & Wheeler upon certain notes described in the stipulation, and that he continued so indebted to Singer & Wheeler up to the time of the assignment of Singer & Wheeler on January 10, 1896, but that the bank had no knowledge or notice of said indebtedness from P. J. Singer to Singer & Wheeler on said September 14, 1893, nor till after the assignment of Singer & Wheeler; that at the time said warehouse certificates were pledged by P. J. Singer to the bank, the board of directors of Singer & Wheeler had

taken no action arranging for or authorizing P. J. Singer to pledge said warehouse certificates as collateral security for his debt to the bank; that P. J. Singer, if present, would testify (and he was to be considered as testifying) that he had no recollection of making to the officers of the bank the statements as to the indebtedness of Singer & Wheeler to him, and as to an arrangement with Singer & Wheeler, by which he was authorized to pledge said warehouse certificates as collateral to his debt to the bank, which said officers testified he did make to them, as set out fully in our former statement and opinion; and, further, that P. J. Singer would testify that at that time he had not in fact consulted the officers or agents of Singer & Wheeler, other than himself, about pledging said warehouse certificates for his own debt, and had made no arrangement therefor. The court below rendered judgment for the bank, and the assignee prosecutes this appeal.

The evidence embraced in the stipulation destroys some of the inferences which in our former opinion we drew from the silence of the former record. The question now is whether, under the evidence now before us, Singer & Wheeler and its assignee are estopped from claiming the warehouse certificates from the bank. P. J. Singer still owes the bank upon said debt a sum larger than the value of the whisky not applied in payment of taxes thereon. We adhere to our former conclusion as to the rules of law governing the title of an assignee and his right to recover, and hold that the plaintiff only stands in the shoes of Singer & Wheeler. We before held the statements of P. J. Singer to the bank, on and shortly before the arrangement of September 14, 1893, were self-serving, and the bank could not rely upon them. The new testimony, that P. J. Singer does not remember making said statements to the officers of the bank, is by no means a denial that he made the statements. In view of the fact that he now confesses the statements were untrue, his inability to deny that he made them is rather in the nature of a confession that he did so state. His testimony, therefore, has no tendency to overcome the

testimony of the bank officers as to what he told them. It now appears said statements were in fact false, but that the bank did not know it at that time, nor at any time up to the assignment of Singer & Wheeler, January 10, 1896.

P. J. Singer gave his $10,000 note to the bank (a renewal of two notes of $5,000 each) on September 14, 1893, and on that day, as collateral security, he pledged to the bank the warehouse certificates now in question (or their predecessors, as some of the whisky was removed from the bonded warehouse to the free warehouse, and the old certificates surrendered and new ones issued for the same whisky), he then and previously claiming to the bank officers that Singer & Wheeler owed him more than $10,000, and that he could pay his debt to the bank if Singer & Wheeler could withdraw that sum from its business and pay him; but that it could not then do so; and that he had made an arrangement by which he could and did pledge the said warehouse certificates to the bank as collateral for his debt. At that time the bank still held said certificates as collateral to a note of Singer & Wheeler for $5,000, upon which $4,000 had been paid. What are the acts, facts and circumstances which tend to estop Singer & Wheeler (and therefore to estop its assignee) from now claiming said certificates as against the bank?

First. On September 20, 1893, one week after said certificates were pledged for P. J. Singer's debt, an officer or representative of Singer & Wheeler came to the bank and paid the remaining $1,000 due from Singer & Wheeler to the bank, and took up the $5,000 note given by Singer & Wheeler to the bank. If Singer & Wheeler had not consented to the pledging of said certificates for the debt of P. J. Singer—if the corporation knew nothing of that pledge, or knowing had not consented—the one natural thing to have then done was to call for and take up said certificates, whose office as security for the note of Singer & Wheeler was now terminated by the final payment upon that debt. On the theory of appellant, no reason existed why the corporation should not then repossess itself of its certificates.

The person paying the Singer & Wheeler note did not ask for them. This silence was an apparent recognition and ratification of their having been also pledged for P. J. Singer's personal debt. It tended to lull the officers of the bank into entire security that they were properly so pledged.

Second. Shortly thereafter an officer of the bank carried these certificates to W. A. Singer and told him the bank had been holding them as collateral to a note of Singer & Wheeler, but now held them as collateral security for a note of P. J. Singer, and asked him to indorse them for Singer & Wheeler. W. A. Singer was one of the three directors of Singer & Wheeler, and was its secretary. He was at the office of Singer & Wheeler where its books and records were. The evidence shows Singer & Wheeler did not then owe the bank anything. The object and effect of the indorsement requested was to put the title to said certificates out of Singer & Wheeler so that they could be effectively used by the bank as security for P. J. Singer's note. W. A. Singer was an officer intrusted by the Singer & Wheeler corporation with the conduct of its business. He thereupon indorsed these certificates in the name of Singer & Wheeler and delivered them so indorsed to the officer of the bank; and W. A. Singer testified, "I indorsed those warehouse receipts so the bank could hold them as collateral for a note of $10,000 given by P. J. Singer a short time before." It is clear W. A. Singer knew of the note P. J. Singer had given. He did not hesitate; he made no further inquiry. He did not deny or question the propriety of the pledging. By this act at that time the secretary of Singer & Wheeler knowingly indorsed and delivered these certificates to the bank for the purpose of enabling it to hold, use and enforce them as security for P. J. Singer's note. There is no basis for attributing bad faith to the bank. The prompt action of the secretary made it unnecessary for the bank's officer to make any further inquiry or go into any further particulars. This officer of Singer & Wheeler acted as if he understood the situation perfectly,

and he at once placed the complete legal control of the certificates in the bank for that particular purpose. If private corporations are to be bound by the acts of their officers when at their office, engaged in their business, then these securities were on that day pledged for this debt. Certainly the bank was not required to go further. Of whom should the bank have made further inquiries? Not of Barker, the third director—for he did not transact any of the affairs of the corporation, and his only official act was to meet with the other directors about once a year. Not of any subordinate employe—that would have been an act of impertinence, after the secretary had so promptly indorsed said certificates and re-delivered them for the express benefit and use of the bank.

Third.   In the spring of 1894, some six months after the certificates were so pledged for the debt of P. J. Singer, Singer & Wheeler wished to use five barrels of a particular brand of said whisky. Singer & Wheeler thereupon procured a certificate for five barrels of other whisky, and its secretary went to the bank and left the new certificate in pledge for P. J. Singer's note, and withdrew a certificate for five barrels of the desired brand. This was a clear recognition of the right of the bank to hold said certificate as security of P. J. Singer's note.

Fourth.   A tax of $2,933.70 on part of this whisky came due, and the bank paid it. It was not a debt of Singer & Wheeler direct, but it was a lien upon property in which Singer & Wheeler had at least the residuary interest. It does not appear Singer & Wheeler requested the payment, but it afterward ratified it.

Fifth.   On June 1, 1894, another tax of $2,950.90 came due on other parts of this whisky, and a draft was drawn on Singer & Wheeler therefor, and Singer & Wheeler on June 6, 1894, in writing requested the bank to pay said draft, with exchange, and the bank complied. Singer & Wheeler well knew for what purpose the bank held the certificates, and that the only reason why it would advance this money to pay the tax was to protect its security for

P. J. Singer's debt. When Singer & Wheeler made this request it was a recognition of the bank's right.

Sixth. On June 23, 1894, Singer & Wheeler gave its note to the bank for $5,956.48, the amount the bank had advanced for said taxes and interest. True, this was done to make the bank's books appear in proper condition, but still it was a ratification of the bank's action, and done with full knowledge that the bank's only reason for making such heavy advances was to protect its security for P. J. Singer's note.

Seventh. Part of the whisky was afterward sold by the bank, and said last note of Singer & Wheeler paid from the proceeds, and a surplus applied upon the note of P. J. Singer, and no objection to that action was made by Singer & Wheeler.

Eighth. From September 14, 1893, till January 10, 1896, two years, three months and twenty-seven days, Singer & Wheeler was not merely a going concern, but it was doing a very heavy business. It did a business of one million dollars in 1893, nearly one million in 1894, and nine hundred thousand in 1895. During all that time it never questioned this transaction, never sought to repossess itself of these warehouse certificates, and never even asked for them. The proofs show that in September, 1893, P. J. Singer, though perhaps in fact secretly insolvent, was known to the public as solvent and a man of large means. He was insolvent before the assignee first questioned the validity of this pledge. The bank had been lulled into security by the possession of these warehouse certificates, and by the acts and conduct of Singer & Wheeler in reference thereto. In our judgment, after such long silence, Singer & Wheeler ought not now to be permitted to deprive the bank of its security. Indeed we are of the opinion that the facts and circumstances, and the absence of claim by Singer & Wheeler above stated, and the lapse of time during which the pledging of these certificates went unchallenged by Singer & Wheeler, justifies the inference that the pledging was with the assent of the corporation. L., N. A. & C. Ry. Co. v. Carson, 151 Ill. 444.

The rulings of the court below, upon the propositions of law submitted by plaintiff, were in harmony with the views expressed in this opinion, and more fully in our former opinion. The proposition modified and given covers the case. Special complaint is made of the refusal of proposition No. 1. It is open to the construction that the court was thereby to say that plaintiff was not estopped to show that P. J. Singer had no right to pledge these certificates to secure his own debt. That was in part a question of fact upon which the court can not be required to pass under the guise of a proposition of law. If the proposition did not mean that, then it stated a self-evident proposition which should have been given. But even if it were error to refuse it, the error should not reverse, for we are of opinion the judgment is right. The judgment is affirmed.