Victor A. Dorsey and Company et al., Appellees, v. Central Republic Trust Company, Garnishee, Appellant.

Gen. Nos. 37,342, 37,343.

Opinion filed October 16, 1934.

Arthur J. Hughes, for appellant; R. A. Bullinger and Joseph A. Greaves, of counsel.

Nat M. Kahn and Townley, Wild, Campbell & Clark, for certain appellees; Nat M. Kahn, Glenn G. Paxton and Richard C. Bleloch, of counsel.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

On April 20, 1933, a garnishment suit was commenced in the municipal court by Joseph Harris (upon a judgment rendered in his favor for $9,718.11, against Victor A. Dorsey Co., hereinafter called the Dorsey Co., Victory A. Dorsey individually, and H. Walker) against the Central Republic Trust Co. (by its then name) and the National Bank of the Republic of Chicago (afterward dismissed as a garnishee by stipulation). On November 10, 1932, another garnishment suit had been commenced in the same court by Eli H. Brown, Jr. (upon a judgment rendered in his favor for $1,595.79, against said Dorsey Co. and Victor A. Dorsey) against the Central Republic Trust Co. and the National Bank of the Republic (afterward dismissed as a garnishee). After interrogatories and answers thereto had been filed in the respective cases (said answers being contested) it was ordered, by stipulation of the parties, that the two cases be consolidated for hearing. Thereafter there was a somewhat protracted trial on one record before the court without a jury, at which considerable oral and written evidence was introduced, and on December 4, 1933, the court entered its findings and judgments. In the *Harris* case it found the issues against the garnishee, Central Republic Trust Co. (hereinafter called the Bank) and entered judgment against it in favor of Harris in the sum of $7,388.74. In the *Brown* case the court found the issues against the garnishee and entered a separate judgment against it in favor of Brown in the sum of $1,695.95. From these judgments separate appeals were perfected by the garnishee bank.

Thereafter in this court stipulations of the parties were filed to the effect that the two appeal causes be consolidated for hearing; that the complete record filed, and the abstracts and briefs to be filed, in cause

No. 37,343, be taken and considered as such in No. 37,342; and that the opinion to be rendered by this court in cause No. 37,343, stand as its opinion in No. 37,342, etc.

In the *Harris* case the bank filed its answer to the interrogatories in the municipal court on May 18, 1933. This answer is somewhat similar to the answer, filed December 5, 1932, in the *Brown* case, and is in substance as follows:

1. That at the time of the service of the garnishment writ upon it, April 21, 1933, it was not indebted to the Dorsey Co., or to Victor A. Dorsey, individually, "except as hereinafter set forth."

2. That at that time it had, and since has had, in its possession as holder and owner a note executed by the Dorsey Co., on which a balance of $190.99 is past due; that the note is secured by certain collateral securities (describing the same); that this garnishee is not informed whether or not Dorsey & Co. has any title, interest or equity in said securities, but it believes that such title, etc., belongs to Dorsey, individually; that the securities are also held by it as collateral to a personal note of Dorsey, also held by this garnishee; and that there is no equity in the securities over and above the amount of the loans.

3. That at said time it did not have in its possession or control any lands, goods or chattels of the Dorsey Co. or of Dorsey individually, except as stated.

4. That at said time it did not have in its possession or control any rights, credits or effects (not before specified) from it due and owing to the Dorsey Co. or Dorsey.

5. That at said time it did not have, nor has it now, in its possession or control any property, goods, chattels, rights, credits or effects, belonging to the Dorsey Co. or Dorsey, except as stated.

6. That as to said Dorsey, individually, this garnishee states as follows:

(a)  That at the time of the service of said writ this garnishee was not indebted to Dorsey, "except as hereinafter set forth."

(b)  That at said time it had, and since has had, in its possession, as the legal holder and owner, two notes, executed by Dorsey (alias V. A. Dorszeski)— one being dated March 26, 1931, payable 30 days after date to the order of National Bank of the Republic of Chicago, in the amount of $5,689.71, and the other being dated March 26, 1931, payable 30 days after date to the order of the last mentioned bank, in the amount of $85,694.45, upon which there still remains a balance due of $49,488.65; and that both of the notes are secured by certain stocks, etc., deposited as collateral security (here is set forth a list of the securities).

(c, d and e)  That at said time this garnishee did not have in its possession, control or custody, any lands, goods or chattels, or any rights, credits or effects due to Dorsey, individually, or to said Dorsey Co. except as above set forth, etc.

Upon the trial the following facts, *inter alia,* were disclosed in substance:

The Dorsey Co. was incorporated in September, 1928, and thereafter engaged in business as engineers. Dorsey was the owner of a majority of its capital stock and was its president and treasurer and its active head.  His wife was the secretary of the company.  During the years 1930 and 1931, it did considerable engineering work for the Arkansas Natural Gas Corporation (hereafter called the Arkansas Co.). As the work progressed payments aggregating $20,000 were made by it to the Dorsey Co.  The work was substantially completed during the spring of 1931. The Dorsey Co. about that time claimed that there was a balance due to it of more than $40,000, but the Arkansas Co. claimed that the balance due was much less and the dispute resulted in litigation.  On De-

cember 2, 1931, the Dorsey Co. brought an attachment suit in the superior court of Cook county to recover the claimed balance. The suit was settled on December 14, 1931, by the Arkansas Co. delivering its draft for $32,000, payable to the order of the Dorsey Co. This draft was indorsed by Dorsey, as president of the Dorsey Co., but, because of certain transactions had at the time and prior thereto as hereinafter mentioned, no part of the proceeds of the draft ever came into the hands of the Dorsey Co.

In the meantime Dorsey, individually, and the Dorsey Co. had borrowed money from the National Bank of the Republic (predecessor of the garnishee bank). These loans were evidenced by three collateral notes, each dated October 11, 1930. One was executed by the Dorsey Co., with Dorsey's personal indorsement thereon, for $1,492.68. Two, being respectively for $11,000 and $87,136.90, were executed by Dorsey, individually. Each was payable to the National Bank of the Republic and was secured by collateral deposited with that bank. On November 22, 1930, after the notes had matured and were not paid, that bank sent notices of a proposed foreclosure sale, on November 25th, of the collateral securing Dorsey's two notes and of the collateral securing the note of the Dorsey Co. Each notice was signed by the bank "by Richard A. Griffin, duly authorized agent and attorney." Immediately after the notices had been received Dorsey conferred with his confidential secretary, Violet Padgitt, who also was the bookkeeper of the Dorsey Co., stated that he needed a considerable amount of money immediately, and asked if she could ascertain what was the amount then due to the Dorsey Co. from the Arkansas Co. on its account. She replied that she could not determine the amount without much checking over of accounts on the books of the Dorsey Co., but she said that the Dorsey Co. owed Dorsey, indi-

vidually, the sum of approximately $55,000, for moneys previously advanced by Dorsey to the company and for uncollected back salaries due to him as president, etc. And she *"suggested* to him that he withdraw the needed money from the company in payment of what the company was indebted to him.'' Dorsey thereafter had several interviews with Griffin in order to prevent, if possible, the proposed sale of the collateral. Dorsey testified: ''I was told by Griffin that if I could put up additional collateral that my loan or notes would be renewed for a period of time. It was then that I arranged to submit this collateral of the account receivable of the Arkansas Co. I told Griffin that I had an account, amounting to some $42,000 or $45,000 that was due from the Arkansas Co., and that I would submit that account as additional collateral. Griffin asked me *what authority I had to assign the account.* I told him I had taken the matter up with my *bookkeeper,* and that the Dorsey Co. was indebted to me to the extent of $55,000, or more, and that I could submit the account as collateral. As a result the foreclosure sale did not take place. The notes were renewed. After the assignment of the account was made I wasn't bothered for some time until the renewal notes became due and the bank *was anxious to get the cash on the assignment.''* This assignment of said account was not produced upon the trial. The garnishee bank claims that apparently it was lost or mislaid. Dorsey further testified: ''I put my signature on this assignment on behalf of the Dorsey Co. I signed it in my office (1st National Bank Building, Chicago). The secretary of the company (Dorsey's wife) also signed it, and the corporate seal was put upon it. The last time I saw the assignment was when I turned it over to Mr. Griffin *on or about November 24th or 26th, 1930.* It ran to the National Bank of the Republic. . . . I received nothing at the time it

was delivered, as it was collateral.'' Griffin testified that he, as the agent and attorney for the bank, drafted the assignment by the Dorsey Co. of the Arkansas Co.'s account; that the National Bank of the Republic was the named assignee; that he did not see the assignment executed, but that after its execution it ''was handed to me by Dorsey and I kept it in my file for over a year''; and that in the latter part of 1931, after its purpose had been served, he returned it to Dorsey, personally.

After the attachment suit, brought by the Dorsey Co. against the Arkansas Co. in December, 1931, had been settled, resulting in the delivery to Dorsey of its draft for $32,000, payable to the order of the Dorsey Co., and after the judgment in Harris' favor had been entered against the Dorsey Co., Dorsey, on July 21, 1931, in the presence of Griffin and in the lobby of the First National Bank, indorsed said draft in the name of the Dorsey Co., and personally purchased by it a check of said First National Bank, payable to the order of the garnishee bank, for $32,000, which shortly afterward came into its hands and was applied as follows: $30,000, in reduction of the *personal* notes of Dorsey then in the bank's possession, and $2,000 was credited to his individual checking account in the bank. Dorsey testified: ''I used the Arkansas Co.'s draft to purchase the check. I did not cash it at a paying window and get currency. The check which I purchased I turned over to the Central Republic Bank. It was payable to that bank, and I handed it over, not to Mr. Griffin, but to an official of the Central Republic Bank the same day, about an hour afterwards. . . . The Central Republic Bank never gave . . . any part of said check to the Dorsey Co. As far as I know the Central Republic Bank still has the proceeds of that check. . . . Out of the $32,000 check (or draft) received from the Arkansas Co., my account

at the Central Republic Bank was credited with $30,-
000. Out of the other $2,000, I received a loan of
$2,000 from the bank and I put up additional collateral.
. . . This $2,000 . . . was given to me as a de-
posit, a credit to my account.''

When the claimed assignment of the Arkansas Co.'s
account with the Dorsey Co. was made by Dorsey to
the bank, the Dorsey Co. was indebted to the bank
only in the sum of approximately $1,500, as evidenced
by its note secured by separate collateral. And it
appears from the garnishee's answer that this in-
debtedness subsequently was reduced to the sum of
$191. It was not claimed by the bank on the trial
that the assignment was received as additional col-
lateral to secure said indebtedness of the *Dorsey Co.*,
nor was it contended that any part of the $32,000, ulti-
mately received by the bank from the Arkansas Co.,
was credited to said note given by the Dorsey Co.

The main contention of the beneficial plaintiff,
Harris, in the trial court was in substance, as it is
here, that Dorsey, president of the Dorsey Co., fraud-
ulently diverted, without its authority and without any
consideration paid to it, $32,000 of its corporate assets
to the garnishee bank, which sum was applied by the
bank, with knowledge of the facts, to a then existing
*individual* indebtedness of Dorsey to the bank, at a
time after Harris' judgment against the Dorsey Co.
and Dorsey had been rendered, and that because of
such fraudulent diversion Harris is entitled to recover
of the bank in this garnishment proceeding and out
of said $32,000, so diverted, a sufficient sum to satisfy
his judgment, costs of suit, etc. The main contention
of the garnishee bank in the trial court, as it is here,
was in substance that when the assignment of the
Arkansas Co.'s account was made by Dorsey, acting
for the Dorsey Co., to the bank in November, 1930,
as further collateral security to Dorsey's individual

indebtedness to the bank, the Dorsey Co. was indebted to Dorsey in an amount of about $55,000, for moneys previously loaned by him to it and for uncollected back salaries as its president, etc.; that this indebtedness to Dorsey was then disclosed on the books of the Dorsey Co., introduced in evidence, and by the testimony of its bookkeeper; that because of this existing indebtedness to Dorsey he had a legal right, as president and active head of the Dorsey Co., and, without any authority so to do obtained from the Dorsey Co., to assign in the name of the Dorsey Co. said account receivable of the Arkansas Co. (then considered to be in the amount of over $40,000) to the bank as further collateral security to Dorsey's *individual* indebtedness to the bank; that when the settlement of the litigation over the amount of the indebtedness due to the Dorsey Co. from the Arkansas Co. was made in December, 1931, Dorsey also had the legal right to indorse the $32,000 check or draft (which was payable to the order of the Dorsey Co.) and cause the proceeds to be delivered to the garnishee bank and to then be applied *pro tanto* upon his then existing *individual* indebtedness to the bank, as evidenced by his collateral notes held by the bank; that there was no fraud practiced in the consummation of the deal; and that the finding and judgments of the trial court are manifestly against the weight of the evidence and against the law.

After carefully considering the evidence and numerous adjudicated cases we are of the opinion that the contention of the bank, both in the trial court and here, is without substantial merit; and that the findings and judgments of the trial court are sufficiently sustained by the evidence and the law. We think that certain holdings and decisions of our Supreme Court in the following cases are here applicable. In *Emporium Real Estate & Manufacturing Co. v. Emrie*, 54 Ill.

345, it appears that Emrie, president of the complainant corporation, claiming that it was indebted to him for salary as president and for certain services rendered to it as an attorney at law, caused its secretary to assign to him certain certificates of purchase issued by the sheriff to the company on a sale of real estate under a judgment in the company's favor. The company filed a bill to compel a surrender of the certificates, and to enjoin the sheriff from making a deed to Emrie. The circuit court decreed a surrender of the certificates, upon payment by the company to Emrie within a certain time of $1,457; that he retain the certificates as security; and that if the money be not paid to him within the time, his title to the certificates should become absolute and the sheriff should make him a deed. In reversing the decree and remanding the cause the court said in part (p. 346):

"This decree cannot be sustained. Emrie and the secretary of the company held these certificates merely as the servants of the company. Their possession was the possession of the corporation, and they had no more right to appropriate those certificates, for the individual benefit of one of them, than they had to seize and carry away the furniture of the company's office. The claim of the president had not been allowed by the board of directors or by a committee appointed by them. In effect, the president audited his own demand, and then seized upon property for its payment. This can never be permitted to the officers of corporations. The toleration of such practice would be destructive of the rights of creditors and of stockholders. The assets would be at the mercy of the officers, who have no legal or equitable right to control them, except for the benefit of the company."

In *Wheeler v. Home Savings & State Bank*, 188 Ill. 34, the plaintiff, as assignee for the benefit of the creditors of Singer & Wheeler, an Illinois corporation,

commenced an action in replevin in the circuit court against the defendant bank to recover certain warehouse receipts for certain barrels of whisky and also to recover the whisky. The property not having been obtained under the writ a recovery subsequently was had for its value under a count in trover. On appeal the Appellate Court reversed the judgment and remanded the cause. On the second trial the court, a jury having been waived, found the bank not guilty and entered a judgment in its favor. On appeal the Appellate Court for the second district affirmed the judgment (85 Ill. App. 28), but our Supreme Court reversed the judgments of the circuit and Appellate Courts and remanded the cause for further proceedings. As appears from the opinion of the Supreme Court, the corporation, in April, 1893, was indebted to the bank for borrowed money, and to secure the same had pledged warehouse receipts issued to and owned by it for the barrels of whisky. In September, 1893, all of its debt to the bank had been paid except $1,000. Before the latter date Peter Singer, who was a director and the treasurer and general manager of the company, owed the bank on his *individual* account $10,000, and his two notes evidencing the debt were past due and the bank was pressing for payment. He wanted more time and told agents of the bank that the company owed him more than the amount of his debt to the bank, and that if it would pay him he could pay the bank, but that its financial condition was such that it could not then do so. It was then suggested to him by the bank's agents that if the company owed him he should take from it the whisky or other of its merchandise for the debt and pledge it to the bank for his own debt. Shortly thereafter he came to the bank and stated that he had made an arrangement and would pledge the whisky as security for his debt. Thereupon he took up the notes, evidencing his debt

to the bank, and gave a renewal note for $10,000, with an agreement showing that he had, in addition to certain shares of stock which he owned, pledged the warehouse receipts for the whisky. At this time these receipts were held by the bank as security for the balance of the company's indebtedness of $1,000 to the bank. They had not been assigned by it but stood in its name. A few days later the company paid to the bank the balance of $1,000 of its indebtedness to the bank, but its agent failed to take up the warehouse receipts. Some time thereafter an officer of the bank observed that said receipts had not been indorsed or assigned by the company, and he took them to the company's office and stated to its secretary (who was the son of said Peter Singer, its manager) that the bank now held them as security for Singer's individual note of $10,000, and that they ought to be indorsed by the company. Thereupon said secretary indorsed the receipts in blank in the name of the company, by himself as secretary, and redelivered them to the officer of the bank. Said secretary testified on the trial that he indorsed them in order that the bank might hold them as security for his father's individual $10,000 note. It was not claimed that the company was in any way responsible for or interested in the individual debt of Singer to the bank, or that the pledging of its property to secure said debt was for its benefit or for any corporate purpose. And the evidence disclosed that when the warehouse receipts were indorsed and when they were received by the bank, the bank knew that they were the property of the company. In reversing the judgment in favor of the bank our Supreme Court said in part (p. 39, italics ours):

"Singer was dealing with the bank in his own interest, and not as the officer or agent of the company. The bank could not, therefore, treat his representations so made in his own interest and against the in-

terest of the company as the representations of the company. (Citing *Moores v. Citizens' Bank,* 111 U. S. 156, 164.) As said by the court of appeals of New York: 'The general rule is, that one who receives from an officer of a corporation the notes or securities of such corporation, in payment of or as security for a personal debt of such officer, *does so at his own peril. Prima facie, the act is unlawful,* and unless actually authorized, the purchaser will be deemed to have taken them *with notice of the rights of the corporation.'* " (Citing *Wilson v. Metropolitan Elevated R. Co.,* 120 N. Y. 145, 150.)

In *Leigh v. American Brake-Beam Co.,* 205 Ill. 147, 150, it is said (italics ours):

"It need scarcely be said that the president and general manager of a corporation has no authority, by virtue of his office, to appropriate the money of the corporation to the use of himself and his partners in his private business. The defendant had full notice, both by the checks and the agreement which he offered to prove, that the money of the plaintiff was being taken by its president, acting in the interest of himself and his associates, to be used for their joint benefit, and not for any purpose or business of the corporation. . . . Although a corporation must act by agents, the general power of an agent does not extend to a case where he *is the person interested on the other side.* Generally, an officer or agent of a corporation cannot act for the corporation and himself at the same time, . . . Every person dealing with an officer of a corporation who assumes to act for it in matters in which the interests of the corporation and officer are adverse, *is put upon inquiry as to the authority and good faith of the officer.*"

In view of the facts of the present case as above outlined, and in the light of the above holdings and decisions, we are of the opinion the trial court was

fully warranted in entering the findings and judgments that it did, and that said judgments should be affirmed.

It is also here contended by counsel for the garnishee bank in substance (a) that the court erred in holding as a proposition of *fact* that "the books of account of Dorsey Co. offered in evidence by the garnishee bank, are *not competent proof* that on or about December 31, 1930, the Dorsey Co. was indebted to Dorsey, individually, in the sum of $53,680.42, or any other sum"; (b) that the court erred in holding as a proposition of *fact* that "no *valid* assignment or transfer was ever made by the Dorsey Co. to Dorsey, individually, of the Arkansas Co.'s account receivable due to the Dorsey Co.''; and (c) that the trial court erred in refusing to hold as a matter of law that the garnishee bank was the "equitable assignee" of the Arkansas Co.'s account receivable, entitling the bank to its discharge as garnishee. All three of these contentions are much discussed in the printed arguments of opposing counsel. No useful purpose will be served in here commenting upon the discussions. Suffice it to say that after considering the three contentions, we have reached the conclusion that if any errors were committed by the trial court in the particulars named they are not such as warrant a reversal of the judgments, in view of all the facts and circumstances in evidence.

Accordingly, the judgment appealed from in favor of Harris for $7,388.74, as first above mentioned, against the garnishee, Central Republic Trust Co., is affirmed.

*Affirmed.*

SCANLAN and SULLIVAN, JJ., concur.